BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON II (247952)
PAULA R. BROWN (254142)
ADAM M. BUCCI (327312)
501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com
pbrown@bholaw.com
abucci@bholaw.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEIL PALLAYA, individually and on behalf of all others similarly situated, | Case No.   2:25-cv-10613 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| TOYOTA MOTOR SALES U.S.A, INC., TOYOTA MOTOR NORTH AMERICA, INC., TOYOTA MOTOR CORPORATION, AISIN CORPORATION, LTD., and AISIN WORLD CORP. OF AMERICA, INC., | |
| Defendants. | **JURY TRIAL DEMANDED** |

BLOOD HURST & O' REARDON, LLP

00226851

1   Plaintiff Neil Pallaya ("Plaintiff"), individually and on behalf of all others
2   similarly situated, upon personal knowledge of the facts pertaining to himself and on
3   information and belief as to all other matters, by and through undersigned counsel,
4   hereby brings this Class Action Complaint against Defendants Toyota Motor Sales
5   U.S.A. Inc. ("TMS"), Toyota Motor North America Inc. ("TMNA"), and Toyota
6   Motor Corporation ("TMC", and together with TMC and TMS, "Toyota"), and Aisin
7   World Corp. of America, Inc. ("AWA", and together with AC, "Aisin.") (Aisin and
8   Toyota are together, "Defendants"), and allege as follows:

9   <u>**NATURE OF THE CASE**</u>

10  1.    Toyota sells and leases various models of Toyota and Lexus vehicles
11  with defective 8-speed automatic transmissions and torque converters (collectively,
12  the "Transmission Assembly"). Aisin, which is 25% owned by Toyota, designed and
13  manufactures the Transmission Assembly in close collaboration with Toyota.

14  2.    To meet tightening federal fuel efficiency standards and rising consumer
15  demand, Defendants jointly developed the Transmission Assembly. The new design
16  was intended to combine performance with efficiency. But it does neither. Instead,
17  because of the flawed design, excessive heat builds up inside the Transmission
18  Assembly's torque converter, causing the transmission fluid to burn and prematurely
19  degrade. This in turn causes clutch damage and otherwise sets off a cycle of internal
20  wear resulting in early failure (the "Transmission Defect"). The result is a
21  transmission that can suddenly fail, shifts erratically, slips, hesitates, loses power,
22  abnormally whines, and progresses to total failure.

23  3.    The following vehicles are at issue and each contain a defective
24  Transmission Assembly:  2017-present Highlander, 2024-present Grand Highlander,
25  2018-2024 Camry, 2017-2020 Sienna, 2019-2022 Avalon, 2019-present RAV4,
26  2023-present Lexus RX350, 2021-present ES250, 2019-present ES350, 2022-present
27  NX250 and NX350, and 2024-present TX350 (the "Class Vehicles").

28

BLOOD HURST & O' REARDON, LLP

00226851

4.      Defendants have known of these problems, but marketed and sold, and continue to market and sell, the Class Vehicles, even though they perform contrary to Toyota's marketing promises and consumers' reasonable expectations.

5.      In keeping with technological developments, the industry standard is for automakers to design and test transmissions to meet long-term durability targets. Automatic transmissions are typically engineered to last more than 200,000 miles. Meanwhile, consumers expect that their vehicles' transmissions will last for the entire useful life of their vehicles without major repair or replacement. And Toyota, like other manufacturers, market their vehicles accordingly. Through a long-term advertising campaign, Toyota has built a brand reputation for producing reliable vehicles with reliable transmissions.

6.      The Class Vehicles purchased and leased by Plaintiff and other Class Members failed to meet these industry standards, Toyota's marketing promises, and consumers' expectations. The Transmission Assemblies do not perform as advertised, as promised, or as warranted. As a result, Plaintiff and the other Class Members received cars worth substantially less than as represented and less than what they paid, while many also paid to have their transmissions repaired and replaced with equally defective Transmission Assemblies.

7.      To recover these losses and correct the practices, Plaintiff brings this action on behalf of himself and all those similarly situated for violations of the California Unfair Competition Law (Bus. & Prof. Code § 17200, et seq.), the California Consumers Legal Remedies Act (Civ. Code § 1750, et seq.), breach of express and implied warranty, fraudulent omission, and unjust enrichment on behalf of owners and lessees of Class Vehicles nationwide or, in the alternative, the multistate or California classes defined below.

## JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(d)(2) because this is a class action in which the amount in controversy exceeds $5,000,000,

BLOOD HURST & O'REARDON, LLP

1   exclusive of interest and costs, and at least one member of the proposed Class is a

2   citizen of a state different from one of the Defendants.

3       9.    This Court also has supplemental jurisdiction over the state-law claims

4   under 28 U.S.C. § 1367 because those claims form part of the same case or

5   controversy as the federal claims.

6       10.   This Court has personal jurisdiction over Toyota and Aisin because both

7   conduct substantial business in California, have purposefully availed themselves of

8   the privilege of doing business here, and sold and leased vehicles to consumers

9   throughout this District.

10      11.   Defendants Toyota Motor North America, Inc. ("TMNA") and Toyota

11  Motor Sales, U.S.A., Inc. ("TMS") are incorporated in California and maintain their

12  principal places of business in Plano, Texas. Under 28 U.S.C. § 1391(c)(2) and (d),

13  each resides in both California and Texas and, within California, in any district where

14  its contacts would subject it to personal jurisdiction if that district were a separate

15  state—including this District, where both maintain extensive sales, marketing, and

16  distribution operations.

17      12.   Venue is proper in this District under 28 U.S.C. § 1391(b)(1)–(2)

18  because Toyota Motor North America and Toyota Motor Sales reside in this District,

19  and because a substantial part of the events and omissions giving rise to the claims

20  occurred here through Defendants' design, marketing, distribution, and sale of the

21  Class Vehicles. Venue in this District is also proper under California Civil Code

22  § 1780(d) because Defendants' unfair and deceptive practices, including the

23  marketing and sale of the Class Vehicles, occurred in substantial part in this District.

## PARTIES

### *Plaintiff Neil Pallaya*

26      13.   Plaintiff Neil Pallaya is a citizen of California and resides in Grass

27  Valley, California.

28

*BLOOD HURST & O' REARDON, LLP*

00226851

3

14.    On or about December 29, 2020, Plaintiff purchased a new 2020 Toyota Highlander L—one of the Class Vehicles—from Auburn Toyota in Auburn, California, for personal, family, and household use.

15.    Plaintiff's Class Vehicle was sold with a 5-year/60,000-mile Limited Powertrain Warranty and is equipped with a 2GR-FKS (3.5 L V6) gasoline engine and UA80E 8-Speed Automatic Transmission Assembly.

16.    At the time of purchase, Plaintiff was unaware that the vehicle's Transmission Assembly was defective. Before purchasing, he reviewed Toyota's promotional materials—including Toyota's website, the Monroney label, and dealership advertising—and spoke with at least one Toyota sales representative. None disclosed the existence of the Transmission Defect.

17.    Through his exposure to Toyota's advertisements, promotional materials and other public statements, Plaintiff understood that Toyota vehicles were marketed as safe, reliable, and long-lasting, which was material to his purchase decision. Plaintiff relied on these representations in selecting and purchasing his Class Vehicle, believing it to be safer and more dependable than competing vehicles not promoted as safe or dependable.

18.    Toyota never disclosed, prior to Plaintiff's purchase, that the Class Vehicle was equipped with a Transmission Assembly prone to overheating, fluid degradation, and premature failure. Had Toyota or Aisin revealed the defect, Plaintiff would not have purchased the vehicle—or would have paid substantially less.

19.    Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained a Transmission Assembly that was defective and only recently learned of the presence of the Transmission Defect in his Class Vehicle in 2025, shortly before commencing this lawsuit.

20.    Plaintiff maintained his Class Vehicle in accordance with Toyota's recommended maintenance schedule and operated it only in normal, foreseeable

CLASS ACTION COMPLAINT

00226851

BLOOD HURST & O' REARDON, LLP

conditions. Despite such proper maintenance and use, the Transmission Defect rendered the vehicle unfit for its ordinary and intended purpose.

21.    On or about September 12, 2025, with approximately 67,200 miles on the odometer, Plaintiff's Class Vehicle began exhibiting Transmission Defect symptoms, including a persistent high-pitched whining noise when pressing the accelerator.

22.    On September 20, 2025, Plaintiff presented his Class Vehicle to Auburn Toyota for diagnosis and repair. After inspection, the dealership determined that the Transmission Assembly had failed and recommended replacement at an estimated cost of $7,451.33.

23.    Toyota has not repaired or replaced the defective Transmission Assembly with a non-defective unit. All available replacement transmissions are remanufactured with the same design and manufacturing flaws and as a result, continue to suffer from the same Transmission Defect.

24.    Plaintiff continues to experience concerns about the vehicle's safety and reliability. Because the Transmission Defect remains unremedied, Plaintiff faces ongoing risk of sudden loss of power, mechanical failure, increased risk of risk of injury or death, and substantial financial loss.

25.    As a result of Defendants' conduct, Plaintiff did not receive the benefit of his bargain. The Class Vehicle that Plaintiff purchased was of diminished quality and value than represented and failed to meet ordinary consumer expectations regarding safe and reliable operation.

26.    Had Toyota disclosed the Transmission Defect, Plaintiff would not have purchased his Class Vehicle, or certainly would have paid less to do so. Plaintiff would consider purchasing a Toyota vehicle in the future only if Toyota's representations about safety, quality, and durability are truthful and its vehicles are free from concealed defects.

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

00226851

***Toyota Defendants***

27.    Defendant Toyota Motor Sales, U.S.A., Inc. ("TMS") is a corporation organized under the laws of California, with its principal place of business in Plano, Texas. TMS is responsible for the marketing, distribution, and sale of Toyota and Lexus vehicles in the United States, as well as the administration of consumer warranties and service bulletins. TMS manages Toyota's dealer network and directs communications with consumers and service centers nationwide.

28.    Defendant Toyota Motor North America, Inc. ("TMNA") is a corporation organized under the laws of California, with its principal place of business in Plano, Texas. TMNA serves as TMC's North American headquarters and manages Toyota's U.S. research, development, engineering, regulatory compliance, and quality-assurance operations. TMNA exercises control over Toyota's product design, testing, and warranty practices, including those relating to the 8-speed Transmission Assemblies at issue.

29.    Defendant Toyota Motor Corporation ("TMC") is a corporation organized under the laws of Japan, with its principal executive offices in Toyota City, Aichi Prefecture, Japan. TMC is the parent and ultimate controlling entity of Toyota's worldwide operations. Through its subsidiaries, including Toyota Motor North America, Inc. ("TMNA") and Toyota Motor Sales, U.S.A., Inc. ("TMS"), TMC designs, engineers, tests, and approves the powertrain systems installed in Toyota and Lexus vehicles sold in the United States. TMC oversees and benefits from the sale of Toyota and Lexus vehicles nationwide and directs its subsidiaries regarding product design, quality, and warranty decisions.

30.    TMC, TMNA, and TMS operate as a unified and integrated enterprise. They share overlapping officers, directors, and management structures. TMNA and TMS maintain a unified corporate headquarters campus in Plano, Texas, from which TMC oversees and directs Toyota's North American operations. The three entities coordinate decision-making concerning vehicle design, testing, marketing, and post-

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

BLOOD HURST & O' REARDON, LLP

1    sale support; jointly develop and approve warranty and recall policies; and present

2    themselves publicly as a single enterprise under the Toyota brand. Consumers interact

3    with "Toyota" as one entity, and TMC holds itself out as responsible for the design,

4    safety, and performance of Toyota and Lexus vehicles sold in the United States,

5    including California.

6        31.    TMC purposefully directs and controls substantial business activities

7    toward the United States and California through TMNA and TMS. It monitors field

8    data, warranty claims, and consumer complaints originating from California; makes

9    final determinations regarding defect investigations and warranty coverage; and

10    benefits directly from sales of Toyota and Lexus vehicles in this forum. TMNA and

11    TMS act as TMC's agents and instrumentalities, performing functions that TMC

12    would otherwise perform itself.

13        32.    The claims asserted herein arise out of and relate to TMC's forum-

14    directed conduct. The Transmission Assemblies were designed, approved, and

15    supplied under TMC's supervision and control, and TMC intended and expected those

16    products to be installed in vehicles sold and operated throughout the United States,

17    including California. Exercising jurisdiction over TMC is reasonable and consistent

18    with due process because TMC maintains continuous and systematic business

19    contacts with California through its integrated operations and derives substantial

20    revenue from this forum.

21        33.    California has a significant connection to Defendants' misconduct and

22    to the claims of all Class Members. Toyota Motor North America, Inc. and Toyota

23    Motor Sales, U.S.A., Inc. are California corporations that continue to conduct

24    substantial business operations here. Toyota maintains more dealerships, service

25    centers, and logistics facilities in California than in any other state; operates major

26    engineering, research, and quality-control divisions in Gardena, Torrance, San

27    Francisco, Los Altos, and Long Beach; and derives billions of dollars in annual

28    revenue from the sale, lease, and servicing of Toyota and Lexus vehicles in this State.

00226851

CLASS ACTION COMPLAINT

1    Decisions concerning the design, testing, marketing, and warranty administration of

2    the Class Vehicles were made or directed in significant part from California.

3    Accordingly, California has a substantial interest in regulating Defendants' conduct

4    and applying its laws to the claims of the nationwide Class.

5    ***Aisin Defendants***

6    34.    Defendant Aisin Corporation, Ltd. ("Aisin Corp."), formerly known as

7    Aisin AW Co., Ltd. and Aisin Seiki Co., Ltd., is a corporation organized under the

8    laws of Japan, with its principal executive offices in Kariya City, Aichi Prefecture,

9    Japan. Aisin Corp. designs, engineers, and manufactures transmission systems, torque

10   converters, and related components supplied to Toyota and installed in Toyota and

11   Lexus vehicles sold throughout the United States. Aisin Corp. conducts substantial

12   business in the United States and in California directly and through its subsidiaries,

13   and derives significant revenue from the sale of its products for vehicles sold and

14   operated in this forum. Aisin Corp. regularly collaborates with Toyota's engineering

15   and manufacturing divisions on transmission design, validation, and warranty

16   analysis, including activities directed from California.

17   35.    Defendant Aisin World Corporation of America, Inc. ("AWA") is a

18   corporation organized under the laws of Michigan, with its principal place of business

19   in Northville, Michigan. AWA is a wholly-owned subsidiary and North American

20   operating arm of Aisin Corp. AWA serves as Aisin Corp.'s agent and technical center

21   for the marketing, sale, testing, and customer support of transmission systems and

22   other drivetrain components supplied to Toyota and Lexus vehicles sold in the United

23   States. AWA maintains engineering and service facilities in the United States,

24   including technical coordination with Toyota entities located in California.

25   36.    Aisin Corp. and AWA operate as a unified and integrated enterprise.

26   They share overlapping directors and officers, coordinate product-development and

27   warranty activities, and present themselves publicly as a single corporate group under

28   the "Aisin" brand. Aisin Corp. controls AWA's operations, finances, and policies and

BLOOD HURST & O' REARDON, LLP

8

CLASS ACTION COMPLAINT

benefits directly from AWA's U.S. business activities. AWA acts as Aisin Corp.'s agent and instrumentality for the purpose of designing, testing, selling, and servicing transmission components used in Toyota and Lexus vehicles throughout the United States, including California.

37.    Aisin Corp. purposefully directs its conduct toward the United States and California. It designed, approved, and supplied the 8-speed automatic Transmission Assemblies at issue, with the intent and expectation that those assemblies would be installed in vehicles distributed and sold nationwide. Aisin Corp. monitors warranty and field-failure data originating from California and collaborates with Toyota's California-based quality and engineering offices regarding transmission-performance issues. Aisin Corp. derives substantial revenue from its continuing course of conduct directed at this forum, and the claims in this action arise out of and relate to that forum-directed conduct. The exercise of jurisdiction over Aisin Corp. is reasonable and consistent with due process under Fed. R. Civ. P. 4(k)(2) and Ninth Circuit precedent.

38.    At all relevant times, the Aisin Defendants acted in concert with the Toyota Defendants to design, manufacture, and distribute the defective Transmission Assemblies, to conceal the defect, and to misrepresent the safety, quality, and performance of the Class Vehicles. References in this Complaint to "Aisin" or "Defendants" include Aisin Corporation, Ltd. and Aisin World Corporation of America, Inc., unless otherwise specified.

## FACTUAL BACKGROUND

### *Defendants Jointly Developed the Transmission Assemblies*

39.    Toyota is the world's largest automotive manufacturer, designing, producing, and selling millions of vehicles annually under the Toyota and Lexus brands. In the first quarter of fiscal year 2025, Toyota Motor Corporation reported consolidated vehicle sales of approximately 2.4 million units and revenue of $84.5 billion. Of those sales, Toyota reported approximately 794,000 vehicles sold in North

BLOOD HURST & O'REARDON, LLP

9

00226851

America during the same period.[1] Toyota has long branded itself as the maker of safe and dependable vehicles, spending billions of dollars on advertising that links its products to safety, reliability, and durability.

40.    Aisin Corporation is one of the world's largest Tier-1 automotive suppliers, producing transmissions and other drivetrain components for Toyota and other manufacturers. In 2022, Aisin recorded approximately $31.2 billion in consolidated global net sales, with $6.2 billion attributed to sales in North America.[2]

41.    Acting jointly, Toyota and Aisin designed, engineered, tested, validated, and manufactured the Transmission Assemblies installed in the Class Vehicles. By placing those vehicles into the stream of commerce, Defendants exposed purchasers and lessees to an unreasonably dangerous defect that causes premature transmission failure and related safety hazards.

### *Toyota Defendants*

42.    Defendant Toyota Motor Sales, U.S.A., Inc. ("TMS") is also a California corporation with its principal place of business in Plano, Texas. TMS is responsible for the marketing, distribution, and sale of Toyota and Lexus vehicles in the United States, as well as the administration of consumer warranties and service bulletins. TMS manages Toyota's dealer network and directs communications with consumers and service centers nationwide.

43.    Defendant Toyota Motor North America, Inc. ("TMNA") is a California corporation with its principal place of business in Plano, Texas. TMNA is a wholly-owned subsidiary of TMC and serves as TMC's North American headquarters, overseeing research, development, regulatory compliance, and quality operations for

---

[1]    *See* Toyota Motor Corp., "TMC Announces April Through June 2025 Financial Results," *Toyota Pressroom* (Aug. 7, 2025), https://pressroom.toyota.com/tmc-announces-april-through-june-2025-financial-results/ (last visited Nov. 3, 2025).

[2]    *See* Aisin World Corp. of Am., "HQ & Sales," Aisin Corporation (2025), https://www.aisinworld.com/about-aisin-group/north-and-central-american-network/hq-sales/ (last visited Nov. 3, 2025).

BLOOD HURST & O' REARDON, LLP

00226851

CLASS ACTION COMPLAINT

vehicles sold in the United States. TMNA exercises control over Toyota's product engineering and warranty decisions, including those relating to the Transmission Assemblies at issue.

44.    Defendant Toyota Motor Corporation ("TMC") is a corporation organized under the laws of Japan with its principal offices in Toyota City, Aichi Prefecture, Japan. TMC is the parent and ultimate controlling entity of Toyota's worldwide operations. Through its subsidiaries, including Toyota Motor North America, Inc. ("TMNA") and Toyota Motor Sales, U.S.A., Inc. ("TMS"), TMC designs, engineers, tests, and approves the powertrain systems installed in Toyota and Lexus vehicles sold in the United States. TMC oversees and benefits from the sale of Toyota and Lexus vehicles nationwide and directs its subsidiaries regarding product design, quality, and warranty decisions.

45.    TMC, TMNA, and TMS operate as a unified and integrated enterprise. They share overlapping officers, directors, and management structures. TMNA and TMS maintain a unified corporate headquarters campus in Plano, Texas, from which TMC oversees and directs Toyota's North American operations. The three entities coordinate decision-making concerning vehicle design, testing, marketing, and post-sale support; jointly develop and approve warranty and recall policies; and present themselves publicly as a single enterprise under the Toyota brand. Consumers interact with "Toyota" as one entity, and TMC holds itself out as responsible for the design, safety, and performance of Toyota and Lexus vehicles sold in the United States, including California.

46.    TMC purposefully directs and controls substantial business activities toward the United States and California through TMNA and TMS. It monitors field data, warranty claims, and consumer complaints originating from California; makes final determinations regarding defect investigations and warranty coverage; and benefits directly from sales of Toyota and Lexus vehicles in this forum. TMNA and

BLOOD HURST & O' REARDON, LLP

00226851

1    TMS act as TMC's agents and instrumentalities, performing functions that TMC

2    would otherwise perform itself.

3        47.    The claims asserted herein arise out of and relate to TMC's forum-

4    directed conduct. The Transmission Assemblies were designed, approved, and

5    supplied under TMC's supervision and control, and TMC intended and expected those

6    products to be installed in vehicles sold and operated throughout the United States,

7    including California. Exercising jurisdiction over TMC is reasonable and consistent

8    with due process because TMC maintains continuous and systematic business

9    contacts with California through its integrated operations and derives substantial

10   revenue from this forum.

11       48.    California has a significant connection to Defendants' misconduct and

12   to the claims of all Class Members. Toyota Motor North America, Inc. and Toyota

13   Motor Sales, U.S.A., Inc. are California corporations that continue to conduct

14   substantial business operations here. Toyota maintains more dealerships, service

15   centers, and logistics facilities in California than in any other state; operates major

16   engineering, research, and quality-control divisions in Gardena, Torrance, San

17   Francisco, Los Altos, and Long Beach; and derives billions of dollars in annual

18   revenue from the sale, lease, and servicing of Toyota and Lexus vehicles in this State.

19   Decisions concerning the design, testing, marketing, and warranty administration of

20   the Class Vehicles were made or directed in significant part from California.

21   Accordingly, California has a substantial interest in regulating Defendants' conduct

22   and applying its consumer-protection statutes to the claims of the nationwide Class.

23   ***The Structure and Claimed Function of the Class Vehicles' Transmission***

24       49.    Each Class Vehicle is equipped with the same or materially identical

25   Transmission Assembly—marketed by Toyota and Aisin as the world's first 8-speed

26   automatic transmission for transverse FWD and 4WD vehicles. Defendants promoted

27

28

BLOOD HURST & O' REARDON, LLP

12

CLASS ACTION COMPLAINT

the design as "achiev[ing] world-class fuel economy while offering both smooth gear shift and sporty shift feeling suitable for luxury cars."[3]

50. According to Defendants, the new 8-speed transmission increased overall fuel economy by 6.6%, reduced torque loss by 38%, and improved acceleration performance by 2.5% compared to the previous 6-speed transmission design.[4]

51. To accommodate the new 8-speed system within the spatial envelope of the outgoing 6-speed transmission, Toyota and Aisin adopted a compact package design, optimized the gear-train architecture and materials, and reduced component count—steps the companies described as enabling a more compact and lighter unit, while "achiev[ing] world-class top level transmission efficiency."[5]

52. While these changes achieved marginal fuel-efficiency gains, they simultaneously introduced thermal, mechanical, and hydraulic vulnerabilities that render the Transmission Assemblies unstable under normal driving conditions.

### *The Transmission Defect*

53. Automatic transmissions rely on hydraulic pressure and automatic-transmission fluid ("ATF") to engage clutches, dissipate heat, and lubricate moving parts. The Class Vehicles' Transmission Assemblies are defectively designed and/or

[3] Aoki, T., Kato, H., Kato, N., and Masaru, M., "The World's First Transverse 8-Speed Automatic Transmission," SAE Technical Paper 2013-01-1274, 2013, https://doi.org/10.4271/2013-01-1274.

[4] *Supra*, footnote 3.

[5] *See* Toyota Motor Corp., "New 8-Speed and 10-Speed Automatic Transmissions (Direct Shift-8AT & Direct Shift-10AT)" (Dec. 6, 2016), https://global.toyota/en/powertrain/transmission (last visited Nov. 3, 2025). *See also* Aisin Corp., "New Toyota Camry Incorporates a Variety of Aisin Group Products" (July 14, 2017) ("Also, in the power train field, in addition to the above five products, New Camry for North America, launched in June, is equipped with the 8-Speed FWD Automatic Transmission, which boasts the world-highest transmission efficiency, jointly developed with Toyota."), https://www.aisin.com/en/news/2017/005105.html (last visited Nov. 3, 2025).

BLOOD HURST & O' REARDON, LLP

13

00226851

manufactured such that heat, friction, and fluid degradation occur prematurely, leading to rapid internal wear and eventual transmission failure.

54.    The Transmission Defect results from the combined design and calibration of the Transmission Control Module ("TCM") software and the mechanical configuration of the 8-speed system. The TCM's programming prioritizes early upshifts and torque-converter clutch ("TCC") engagement to maximize fuel economy, causing frequent cycling between shifts and clutch operations that places excessive stress on internal parts and transmission fluid.

55.    Within the torque converter, these repeated partial lock-up and release cycles generate localized heat that accelerates thermal oxidation and breakdown of the automatic-transmission fluid ("ATF"). As the fluid loses its lubricating and cooling capacity, metal-to-metal contact occurs, producing additional heat and friction that shed particles into the ATF and compound internal wear. The transmission's reduced fluid capacity and smaller oil-pump design intensify this overheating process, leading to progressive clutch and gear degradation and, ultimately, premature failure.

56.    As the defect progresses, drivers experience harsh or delayed gear engagement, slipping, lurching, "shift flare," hesitated acceleration, reduced or total loss of motive power, and abnormal transmission noises such as whining or groaning. These conditions occur unpredictably and often under normal driving circumstances, including while merging, accelerating from a stop, or maintaining highway speed.

57.    In many instances, the Class Vehicles suffer complete transmission failure well within 60,000 miles—posing serious safety risks to occupants and other motorists. Modern transmissions, like the ones installed in the Class Vehicles, should survive their expected useful lives of 200,000-plus miles.

58.    The Transmission Defect exists in all Class Vehicles and manifests both during and after the warranty period. It substantially impairs the vehicles' use, value, and safety, rendering them unreliable and unsafe for ordinary operation. Despite this,

14

CLASS ACTION COMPLAINT

Toyota continues to market and warrant the Class Vehicles as safe, dependable, and durable, while concealing the defect and its attendant safety risks from consumers.

### *Toyota Failed to Fix the Defective Transmission*

59.    Between 2016 and 2023, Toyota issued over a dozen Technical Service Bulletins ("TSBs") and internal "Tech Tips" addressing abnormal transmission hesitation, harsh shifting, noise, and related drivability issues in the Class Vehicles. The bulletins apply only to select production periods and plants, leaving many Class Vehicles unaddressed.

60.    Dealers instructed to implement the TSBs merely replaced defective transmissions with identical or remanufactured units, or performed temporary recalibrations of the TCM. These measures do not cure the underlying design defect and often lead to repeat failures. Parts shortages and repair delays further left many owners without functioning vehicles while continuing to make lease or finance payments.

61.    Owners and lessees consistently report online and through NHTSA complaints that their transmissions failed again soon after replacement. For example:

- The contact owns a 2019 Toyota Highlander. The contact stated while driving at an undisclosed speed and attempting to accelerate, the vehicle hesitated and was sluggish while responding. There was an abnormal humming noise detected. There were no warning lights illuminated. The vehicle was taken to the local dealer, where the transmission was replaced, but the failure recurred. While driving 71 MPH and merging into traffic while accelerating, the vehicle failed to respond. The contact was able to veer to the shoulder. The vehicle was taken back to the local dealer; however, the dealer was unable to duplicate the failure. There were no fault codes retrieved. The mechanic at the dealer reported that during the test drive, there was hesitation while downshifting. The manufacturer was contacted, but no assistance was provided. The failure mileage was approximately 16,000. (Emphasis added.)[6]

---

[6]    NHTSA ID: 2012824 (August 5, 2024, Complaint re: 2019 Toyota Highlander)

BLOOD HURST & O' REARDON, LLP

00226851

BLOOD HURST & O' REARDON, LLP

- 2019 toyota highlander bought 3/15/25 with approximately 82,000 miles. Started making whining noise 4/7/25. On 4/9/25 took vehicle to dealer 4/11/25 notified need new transmission and transaxle seal need on new transmission. 2 weeks later on 4/25/25 picked up vehicle drove home 3 days later noticed gear oil leaking and sprayed all over under chassis. Vehicle brought back to dealer on 4/29/25. On 4/30/25 notified needs new transaxle seal on new transmission. Notified on 5/9/25 new transmission will need to be replaced again. They stated there is gouging/nicks where transaxle and transmission connect. Dealer is saying there is no transmission to put in. Toyota has put a stop to all transmissions. So now I have a vehicle with only 82,000 miles and no way to fix it. (Emphasis added.)[7]

- Transmission going out afraid it will come apart or lose power while driving. Toyota dealership told me that we could put new transmission in but it will be the same as the one that is in it and that problem with them has not been corrected and it probably won't hold up long either. Our vehicle only has 71000 miles and we bought it new. (Emphasis added.)[8]

- Faulty transmission with         no         solution        for        a fix. Transmission makes grinding noise while driving. Dealership cannot fix the problem knowing that there is an issue with the 8 speed transmission. They recommend replacement with a salvage transmission out of pocket[9]

62.    These examples illustrate a consistent pattern: Toyota's repair instructions provide only temporary relief and fail to correct the underlying defect. Despite being aware of the safety risks associated with transmission failure, Toyota has neither warned consumers to discontinue use of affected vehicles nor issued a recall or implemented a permanent fix.

---

[7]    NHTSA ID: 11660085 (May 9, 2025, Complaint re: 2019 Toyota Highlander)

[8]    NHTSA ID: 11651486 (March 29, 2025, Complaint re: 2019 Toyota Highlander)

[9]    NHTSA ID: 11626134 (November 19, 204, Complaint re: Toyota Highlander)

16

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

### *Defendants' Knowledge and Concealment of the Transmission Defect*

63.    Toyota and Aisin knew, or were reckless in not knowing, that the Transmission Assemblies were defective long before the Class Vehicles were sold. Pre-production testing, field validation, and warranty analytics revealed that the 8-speed design suffered from excessive heat generation, fluid degradation, and premature clutch wear.

64.    The Transmission Assemblies were jointly developed beginning no later than 2008 under the direction of Toyota Motor Corporation ("TMC") and Aisin Corporation. Aisin's prototype testing repeatedly produced torque-converter overheating and clutch-pack scoring. By 2013, pre-production transmissions exhibited harsh shifting, slipping, and burnt fluid—conditions replicated during Toyota's own validation testing.

65.    By 2015, Toyota and Aisin were aware that their transmission design suffered from abnormal torque-converter clutch engagement, heat generation, and fluid degradation under ordinary load, as reflected in contemporaneous patent filings describing lubrication and durability failures. Rather than redesign or delay production, Toyota approved full-scale manufacturing and installation of the Transmission Assemblies in the 2017-model-year Highlander and other vehicles.

66.    Toyota and Aisin conduct rigorous pre-production testing and analysis on new vehicle components—including standardized procedures such as Failure Mode and Effects Analysis ("FMEA"), Design Validation Plan and Report ("DVP&R"), and bench and dynamometer testing—to evaluate durability and identify potential failures before production. Based on the results of these tests for the 8-speed automatic transmission and torque-converter assemblies, Toyota and Aisin knew or should have known that the design generated excessive heat and premature wear under ordinary operating conditions, well below Toyota's internal durability standards.

17

CLASS ACTION COMPLAINT

67.    Once the Class Vehicles entered the market, Toyota began receiving escalating warranty claims and field reports describing transmission hesitation, surging, slipping, and noise. Toyota monitors such data through its Field Quality Offices in San Francisco and Gardena, California, which collect dealership feedback and forward technical findings to TMNA and TMC. By early 2017, those offices reported instances of burnt ATF and internal clutch scoring consistent with the Transmission Defect.

68.    In addition to consumer complaints, Toyota's internal warranty data reflected a dramatic rise in transmission-related claims immediately after the Class Vehicles entered the market. Toyota's warranty analytics team tracks such data by failure code and component group and routinely shares that information with Aisin under their supplier-quality agreements. By early 2017, Toyota's reports showed a spike in transmission replacements, repeat repairs, and torque-converter failures within the first 60,000 miles—far above normal rates for comparable powertrain components. These data confirmed that the Transmission Assemblies were experiencing premature wear and overheating consistent with the Transmission Defect, and that both Toyota and Aisin were on notice of its prevalence well before any public acknowledgment.

69.    Toyota's warranty analytics group flagged the 8-speed transmission as a "high-priority powertrain concern" by February 2017, prompting issuance of a series of Technical Service Bulletins ("TSBs") addressing "harsh shift," "hesitation," "abnormal transmission noise," and "improper torque-converter operation." Each bulletin described customer complaints matching the Transmission Defect's symptoms but characterized the condition as a calibration issue rather than a defect.

70.    Beginning in or around 2016 and continuing through late 2023, Toyota issued numerous Technical Service Bulletins ("TSBs") and internal "Tech Tips" addressing abnormal transmission operation in the Class Vehicles, yet none resolved the underlying problem. The communications directed dealers to perform software

BLOOD HURST & O' REARDON, LLP

18

CLASS ACTION COMPLAINT

updates, fluid inspections, or limited component replacements—temporary measures that failed to correct the defect. Toyota never disclosed the true cause—thermal overload and fluid oxidation within the Transmission Assembly—or the safety risk posed by sudden loss of motive power.[10]

71.    These communications underscore Toyota's long-standing awareness of the defect and its deliberate strategy of containment rather than correction. The bulletins and internal "Tech Tips" were distributed to dealers to manage customer complaints—not to correct the underlying design flaw. Each new iteration repeated the same narrow calibration instructions and temporary remedies, demonstrating Toyota's continuing awareness that the Transmission Defect persisted across multiple model years and platforms.

72.    Representative Toyota TSBs and related "Tech Tips" addressing transmission performance issues in Class Vehicles include, among others:

- **Tech Tip T-TT-0410** (Aug. 17, 2016) — issued for 2017 Toyota Sienna vehicles experiencing transmission or drivability concerns, directing dealers to open TAS cases for "Early Detection [and] Early Resolution" rather than identify or fix the underlying defect.

- **T-SB-0187-17** (Feb. 20, 2017) — issued for certain 2017 Toyota Sienna vehicles reporting lack of power from a stop, high RPM shift points between 2–3, hesitation in low gears, and delayed gear shifting; instructing dealers only to reprogram the Powertrain Control Module with updated software.

---

[10]    *See, e.g.*, Toyota Tech Tip T-TT-0410 (Aug. 17, 2016); T-SB-0187-17 (Feb. 20, 2017); T-SB-0194-17 (Mar. 2, 2017); T-SB-0330-17 (Dec. 11, 2017); T-SB-0001-18 (Jan. 8, 2018); T-TT-0474-18 (Jan. 10, 2018); T-SB-0010-18 (Feb. 2, 2018); T-SB-0018-18 (Mar. 2, 2018); T-SB-0160-18 (Dec. 18, 2018); Customer Support Program JZC (Apr. 18, 2019); T-SB-0107-19 (Aug. 15, 2019); T-SB-0152-19 (Nov. 1, 2019); T-TT-0580-19 (Nov. 4, 2019 & Jan. 27 2020 (T-TT-0580-19_Rev)); T-TT-0615 (June 1, 2020); L-TT-0288-20 (June 10, 2020); T-SB-0105-20 (Oct. 18, 2020); T-SB-0122-20 (Dec. 14, 2020); T-SB-0008-21 (Feb. 9, 2021); L-SB-0003-21 (Feb. 9, 2021); and T-SB-0087-23 (Nov. 3, 2023).

BLOOD HURST & O' REARDON, LLP

00226851

- **T-SB-0194-17** (Mar. 2, 2017) — issued for certain 2017 Toyota Highlander vehicles with similar drivability complaints (lack of power from a stop, high RPM 2–3 shift points, hesitation in low gears), again directing dealers solely to reprogram the Powertrain Control Module.

- **T-SB-0160-18** (Dec. 18, 2018) — issued for certain 2017–2018 Toyota Highlander and Sienna vehicles exhibiting "a whine noise while driving, a harsh shift, MIL ON, or reduced power," and instructing replacement of the transmission with a remanufactured unit, but only for limited serial-number ranges and within powertrain warranty limits.

- **Customer Support Program JZC** (Apr. 18, 2019) — a voluntary program covering approximately 150,430 model-year 2017–2018 Toyota Sienna and Highlander vehicles equipped with UA80 transmissions, acknowledging reports of "a whine noise from the transmission while driving, harsh shifting, reduced power, and master warning light/check engine light illumination," and offering extended coverage for transmission replacement for a subset of affected vehicles. Toyota stated "[n]ot all vehicles are covered by this Customer Support Program" and informed dealers that "[d]irect marketing of this Customer Support Program" to Class Members is "strictly prohibited" and threatened that "[n]on-compliance of this Policy may result in a claim debit."

- **T-SB-0008-21** (Feb. 9, 2021) — issued for certain 2021 Toyota Camry, Avalon, and Highlander vehicles equipped with the UA80E or UA80F transmissions exhibiting "a whine or grind noise from the transmission," and instructing dealers to replace the transmission with a remanufactured unit, but only for limited serial-number ranges within powertrain warranty limits and meeting specified conditions.

- **L-SB-0003-21** (Feb. 9, 2021) — issued for certain 2021 Lexus ES350 vehicles equipped with the UA80E transmissions exhibiting "a whine or

20

00226851

BLOOD HURST & O' REARDON, LLP

grind noise from the transmission," and instructing dealers to replace the transmission with a remanufactured unit, but only for limited serial-number ranges within powertrain warranty limits and meeting specified conditions.

- **T-SB-0087-23** (Nov. 3, 2023) — issued for certain 2023 Toyota Highlander vehicles experiencing "hesitation when accelerating from a stop" and/or "non-linear acceleration from a stop or rolling stop with steady throttle," directing dealers to reprogram the Powertrain Control Module but not addressing the root cause.

73.    Collectively, these bulletins document the very symptoms alleged herein—hesitation, shift flare, slippage, torque-converter failure, and burnt ATF fluid—confirming Defendants' awareness of the Transmission Defect and their continuing failure to disclose the defect, correct previous misrepresentations, or implement a permanent repair.

74.    Toyota also tracked and analyzed consumer complaints filed with the National Highway Traffic Safety Administration ("NHTSA"), which detailed hesitation, stalling, and transmission failure in Class Vehicles beginning in 2017. Representative examples include:

- "The transmission had a growling noise at low speeds. The dealer said that a new transmission is needed. Online complaints show that a badly designed transmission is failing very early in this vehicle and a class action lawsuit was filed because of this transmission."

  — NHTSA Complaint ID No. 11511994 (March 15, 2023 complaint re: 2018 Toyota Highlander)

- "DRIVING APPROXIMATELY 72 MPH WHEN VEHICLE DIED CAUSING A POTENTIALLY VERY HAZARDOUS SITUATION - CHECK ENGINE LIGHT CAME ON, MASTER WARNING LIGHT CAME ON, SEE DEALER FOR REPAIR MESSAGE DISPLAYED. WAS ABLE TO LIMP TO SIDE OF ROAD AND HAD VEHICLE TOWED TO DEALERSHIP. AFTER 2 DAYS OF DIAGNOSTIC TESTING THE ENGINE CONTROL MODULE (ECM) WAS REPLACED UNDER WARRANTY (LESS THAN

BLOOD HURST & O' REARDON, LLP

00226851

1
2
3

12,000 MILES ON. VEHICLE). THE VEHICLE IS RUNNING, HOWEVER, NOW NOTICE A DECREASE IN GAS MILEAGE AND DIFFERENCE IN TRANSMISSION SHIFTING SINCE REPLACEMENT"

4
5

— NHTSA Complaint ID No. 11054422 (December 13, 2017 complaint re: 2017 Toyota Grand Highlander).

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

- "DEFECTIVE TRANSMISSION: 1: CAR HESITATES TO SPEED UP FROM A FULL STOP OR WHILE IN MOTION. 2: RPM'S GO OVER 3000 BEFORE CAR REACTS (2-3 SECONDS DELAY) , DANGEROUS SPECIALLY WHEN TAKING CURVES OR MERGING INTO TRAFFIC (HIGHWAYS, FAST TRAFFIC ROADS). 3: I FEEL A "HICCUP" LIKE MOVEMENT WHILE IN MOTION (SOMETIMES). 4: CAR HESITATES TO SHIFT OR SHIFTS WHIT EXCESSIVE POWER. 5: DOWNSHIFTS AND LOSS OF ACCELERATION (IT HAPPENS ERRATICALLY DEALER HAVE REPLACED THE VEHICLE TRANSMISSION, BUT THE PROBLEM PERSIST, NOW THEY ARE GOING TO REPLACE THE VEHICLE COMPUTER AND IF THE PROBLEM PERSIST THEY WILL REPLACE THE TRANSMISSION AGAIN. IT SEEMS LIKE THEY DON"T KNOW WHAT THE PROBLEM REALLY IS. UNTIL NOW THIS ARE THE SYMPTOMS I'M EXPERIENCING WITH MY 2018 CAMRY 4-CYL, CERTAINLY SOMETHING I WASN'T EXPECTING FROM A TOYOTA PRODUCT. THE UNPREDICTABLE BEHAVIOR OF THIS CAR IS DANGEROUS, I NEVER KNOW WHEN IS GOING TO RESPONSE AS IT SHOULD DO OR WHEN I'LL HAVE TO FLOOR IT SO IT CAN REV UP AND FINALLY MOVE."

21
22

— NHTSA Complaint ID No. 11221663 (June 21, 2019 complaint re: 2018 Toyota Camry).

23
24
25
26
27
28

- "SINCE I BOUGHT THE CAR IN OCT 2019, THIS HAPPENS EVERYTIME I AM ON LOCAL ROADS (SPEED <50MPH), WHEN I SLOWDOWN PER THE TRAFFIC FLOW, OR TAKING TURN (LEFT OR RIGHT) AFTER YIELDING, THE CAR HESITATES TO ACCELERATE AS IF THE GAS PEDAL DIED ON ME AND THEN I PUSH THE PEDAL FURTHER DOWN ONLY TO GET THE CAR DOWNSHIFT DRASTICALLY AND REVVING UP TO ALMOST ALWAYS ABOUT THE HIT THE

BLOOD HURST & O' REARDON, LLP

22

CLASS ACTION COMPLAINT

CAR IN FRONT (IF ANY) OF ME. IN THE FEW TIMES I AM ON HIGHWAY, WHEN I NEED TO SPEED UP TO CHANGE THE LANE THE CAR ACCELERATES UNPREDICTABLY MAKING THE DRIVING A SCARY EXPERIENCE."

– NHTSA Complaint ID No. 11377378 (Dec. 1, 2020 complaint re: 2019 Lexus ES350)

- "Car has about 16,000 miles. When accelerating slowly from a stop, vehicle hesitates, shakes, and runs rough as it slowly progresses thru first, second, & third gears. After transmission gets in fourth gear, hesitation and roughness goes away. This issue is rapidly getting worse."

– NHTSA Complaint ID No. 11425334 (July 18, 2021 complaint re: 2020 Toyota Sienna)

- "While at a stop sign or light, I have experienced on at least five separate occasions where I press the accelerator and the vehicle does not move. I took it in to the Lexus dealer last year and have set up another appointment again next Monday September 27. There response is that they will put it on their diagnostic machine."

– NHTSA Complaint ID No. 11434058 (Sept. 23, 2021 complaint re: 2019 LEXUS ES350)

- "The contact owns a 2017 Toyota Sienna. The contact stated while driving 60 MPH with her four children in the rear seats, the vehicle started jerking and decelerated independently. Additionally, the transmission was slipping. There was no warning light illuminated. The contact continued driving; however, the transmission continuously slipped out of gear. The vehicle was towed to the dealer where it was diagnosed that the failure was associated with Toyota UA80 Transmission program. The dealer contacted the manufacturer who agreed to cover the repair of the vehicle. The vehicle was repaired. The manufacturer was notified of the failure. The failure mileage was approximately 45,000."

– NHTSA Complaint ID No. 11484475 (Sept. 14, 2022 complaint re: 2017 Toyota Sienna)

- "Transmission lost power while driving and began to slip. Had to pull over immediately. Check engine light illuminated. Happened

CLASS ACTION COMPLAINT

00226851

again several more times before I was able to take to dealer. Dealer was able to reproduce and diagnosed as transmission failure requiring replacement for $10k. Due to the low miles and age (6 years, 3 months) I requested that Toyota help cover costs which they declined to do. This is a dangerous situation and I believe Toyota should have fixed as goodwill.'"

— NHTSA Complaint ID No. 11511424 (March 12, 2023 complaint re: 2017 Toyota Highlander).

- "Intermittent humming sound at 40MPH or faster at around 8k miles. Dealership said it is a normal sound. Humming sound became louder and happens more often. Brought the car back to the dealership and they confirmed that the humming sound is coming from transmission and needs to be replaced. Toyota Camry 2022 SE at 11k miles needs to have transmission replaced.'"

— NHTSA Complaint ID No. 11513893 (March 27, 2023 complaint re: 2022 Toyota Camry).

- "the car started hesitating when accelerating. The vehicle started to lose power and all the lights came on. Check Engine, Pre-collision warning system malfunction, Vehicle stability control system malfunction. Took my vehicle in and Toyota Dealer said at first they couldn't figure out what was wrong. Then decided to replace the transmission. It has been nearly 2 months and still cant get the parts to fix my car. Excuse is Toyota is backlogged. Help"

– NHTSA Complaint ID No. 11525579 (June 6, 2023 complaint re: 2022 Toyota Camry)

- "I am an owner of new 2023 RAV4 and believe some of the newer 2023 & 2024 Toyota Rav4 models with ICE (non-hybrid) have a potentially dangerous defect with the transmission system, which causes these cars to jerk and stutter when the gas pedal is lightly depressed (light acceleration) when the car speed is between 15 and 40 mph and tachometer is between 1500 and 2500 RPM. The reason I believe this defect is potentially dangerous is that a few weeks ago I was going through a school zone with an active 20mph limit, and when trying to keep the speed at 20mph, experienced jerkiness, RPM jump and sudden speed bouncing (momentary jerking from lower to faster and back to lower speeds a few times in a row).

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

Typically this issue is a lot more subtle but occasionally it is so bad that I have a momentary feeling of loosing control over the speed of the car and active school zone is the least place I'd like that to happen. Besides, these stutters are pretty bad disturbers when they occur drawing focus away from the road and onto the car itself, since it does feel like the car is about to stall. I have visited the dealership twice regarding this concern, however since these stuttering have a random nature I was not able to replicate the issue during my visits to the dealership. I have also passed this concern to Toyota USA Corporate office and they in fact have acknowledged that they received numerous complaints on the same matter and suspect the issue is in the newer 8 speed transmission system they are now installing. Unfortunately there has been no further action taken by Toyota to remedy this issue, although they are fully aware of it. Hoping you get more complains on this matter and force Toyota to take action. Thank you!"

– NHTSA Complaint ID No. 11563809 (Jan. 5, 2024 complaint re: 2023 Toyota RAV4)

- "Transmission/transfer case has a known bearing/internal fault that makes a whining sound between 20-40 mph, vehicle has only 56,000 miles. Based on other owner experiences the transmission must be replaced at an estimated cost of 10,000-13,000 dollars."

– NHTSA Complaint ID No. 11596459 (June 25, 2024 complaint re: 2019 Toyota Highlander)

- "8AT transmission failure. Toyota is telling me that it will take 7 months to obtain a replacement transmission."

– NHTSA Complaint ID No. 11607214 (August 8, 2024 complaint re 2020 Toyota Highlander)

- "With 55k miles on a 2020 Toyota Highlander, we began hearing a whine. On various on-line sources it appears that this is not unusual among late teens to early '20s Highlanders. I brought the vehicle to the dealer (with close to 56k miles) and the dealer decided the transmission needs to be replaced. Even though the dealer service center acknowledges this is an ongoing issue w/the Highlander of this (late teens/early '20s) vintage I'm told its a 1-2mo wait for a transmission repair/replacement. Warranty is 60k miles... I was told

be safe and don't go over 60k miles or its possible the warranty might not be honored. While currently operable, a quick internet search indicates, transmission failure often occurs unexpectedly, leaving drivers stranded on the side of the road. This situation can be not only inconvenient but also dangerous."

– NHTSA Complaint ID No. 11614462 (September 13, 2024 complaint re 2020 Toyota Highlander)

- "Regarding Toyota TSB T-SB-0008-21, 'Whine or Grind Noise From the Transmission', issued February 2021: Some 2021 model year Avalon, Highlander, and Camry vehicles equipped with UA80E or UA80F transmissions may exhibit a whine or grind noise from the transmission. This condition may be caused by an issue with the front carrier assembly pinion shafts. This is a widespread problem with these specified transmissions. The noise generally starts around 60-70k miles, just outside the warranty period. Toyota knowingly continued to sell vehicles with these defective transmissions. Repair estimates range from $8.5k-$13k."

– NHTSA Complaint ID No. 11620010 (October 15, 2024 complaint re 2021 Toyota Highlander)

- "I own a 2020 Toyota highlander and the car mileage is 68,000 and the dealer told me my transmission is dead and needs to replacement. The cost for replacement is $13,000.00! I'm the first owner of the car and how could a new Toyota car transmission fail at 68,000 miles and the warranty is 5 yrs or 60,000 miles. This issue have to be Toyota manufacture problems and they should have a recall on this and I researched online and a lot of highlander owners have the same problems as me! NHTSA PLEASE RESEARCH AND HELP HIGHLANDER OWNERS! Thank you"

– NHTSA Complaint ID No. 11622122 (October 26, 2024 complaint re: 2020 Toyota Highlander)

- "Vehicle started making a whining noise and diagnosed at Lancaster Toyota as needing a new transmission at a cost of $8500. Ended up having transmission replaced at a local transmission repair shop for $7000."

– NHTSA Complaint ID No. 11627903 (November 29, 2024 complaint re: 2021 Toyota Highlander)

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

00226851

- "Transmission is shifting roughly and whining. Has to be replaced, on backorder for a month. This is a safety issue as it could fail while driving. Online search finds a service bulletin (T-SB-0008-21) and many, many consumer complaints about the same issue."

  – NHTSA Complaint ID No. 11628363 (December 2, 2024 complaint re: 2021 Toyota Highlander)

- "My transmission started to make whining noise took to the dealer to check they confirmed it was a transmission issue that it needed to be replaced. After doing some digging I came across a toyota service bulitin that claimed this issue only affected a batch of vehicles. ( T-SB-0008-21 ) I have searched on forums and found out that a lot of people are haveing the same issue and Toyota is not doing anything about it. PLEASE HELP !!!"

  – NHTSA Complaint ID No. 11632534 (December 26, 2024 complaint re: 2021 Toyota Highlander)

- "Below is the email that I sent to both the manufacturer and the dealership: I hope your Christmas Eve was better than mine. My son and I were driving up to the Poconos [XXX] to go skiing and I noticed the sonar detection light come on. When we were driving back from the Poconos, the transmission would not catch around the second or third gear. The RPMs would shoot up. The dash / warning lights lit up. I pulled over to the side of the road and I called Lexus dealership, service center, and road side assistance. However, due to the fact that it was [XXX], the offices were closed. I managed to make it to my parent's home, but it was a very dangerous ride on [XXX]. The odometer stated that we were going 50 mph, but we were crawling and the RPMs were 4000. The RPMs at rest were always over 1000. Additionally at times, the gear would not shift into second or third and/or bottom out. Obviously the transmission is beyond malfunctioning. Below are pictures including: 1.) check your engine: A malfunction in the electric control of the engine, throttle or automatic transmission has been detected... 2.) a malfunction in the Intelligent Clearance, Sonar System has been detected 3.) traction control turned off 4.) Secondary Collision Break System malfunction, 5.) System Malfunction 6.) Drive-Start Control Malfunction. The vehicle has just over 3000 miles. I am beyond distraught. My phone number is [XXX] . However, I think it's best if we communicate through email at this point. I planned a

BLOOD HURST & O' REARDON, LLP

family ski trip to Killington, VT for the New Year. I would like to request a loaner vehicle so I can salvage this holiday. I look forward to hearing from you and your service department. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)"

– NHTSA Complaint ID No. 11636883 (Jan. 19, 2025 complaint re: 2024 Lexus RX 350)

- "Grinding noise coming from front end upon acceleration. Brought to dealership who confirmed noises coming from transmission. Transmission needs to be replaced per dealer recommendation. Recalls on 2021 Toyota Camry for same issue. Transmissions on backorder and dealership isn't sure when it will arrive. Unable to provide loaner vehicle until transmission arrives. Will replace with remanufactured transmission and not new per my request. Warranty will not restart at 0 miles even though transmission is "new". Car has less than 30,000 miles and warranty is halfway thru term. Dealership unable to answer questions on what will happen if transmission fails again after warranty."

– NHTSA Complaint ID No. 11656293 (April 23, 2025 complaint re: 2022 Toyota Camry)

75.     These complaints mirror the very conditions Toyota engineers had already documented internally—harsh shifting, hesitation, loss of acceleration, and repeat transmission replacements failing again within months.[11] Toyota, including engineers at its U.S. Technical Center in Gardena, California, reviewed these reports and confirmed internal wear and fluid degradation consistent with the defect.

---

[11]     These complaints quoted verbatim in this Complaint are representative of the many owner reports describing the Transmission Defect. Hundreds of materially similar complaints concerning the same Transmission Defect in Class Vehicles are publicly available through the National Highway Traffic Safety Administration's online database at https://www.nhtsa.gov/vehicle. Upon information and belief, Toyota possesses and monitors numerous additional consumer complaints and warranty records documenting the same defect beyond those publicly filed with the federal regulator.

76.    In addition to the complaints submitted to NHTSA, Toyota monitors and compiles data from numerous public owner forums, review sites, and online complaint portals—including CarComplaints.com, Edmunds.com, ToyotaNation.com, Reddit, and Facebook owner groups—where consumers have for years reported identical drivability and transmission-failure symptoms. For example:

- **"Transmission Bites the Dust - keep or sell?**

  Add me to the list of transmissions needing replacement. 2020 Highlander XLE, 70,000 miles. Whining between 15 and 60 mph. Dealer says it's a $9,600 repair job and parts are a few weeks out. They are asking for help from Toyota, so hopefully some of it is covered there. If that comes back a no - should I get it fixed or sell it??? Still runs and drives fine, but it's my wife's daily driver and I don't want to run the risk of her and the kids stranded somewhere. Do I do a trade in at a dealer if they don't lower the price because they don't notice?"[12]

- **"Highlander Defective Transmission - @Toyota please recall!!!**

  We have a 2019 highlander XLE AWD and estimate for repair from Toyota is 10K out of pocket. The car cannot be driven and transmission has failed. Even with our agreement to pay, Toyota corporate is unresponsive on delivery of replacement. Transmission is on backorder for 120 days+. There are metal shavings in the fluid. Casing is intact so it's clearly defective. They also have not agreed to pay for a loaner. We are past warranty but only by 10-15K."[13]

- **"Toyota Highlander Transmission Issues**

  Do you have anyone have ideas as to how to get Toyota to recall faulty transmissions on 2019-2021 Toyota Highlanders or cover the full or even partial cost of replacement? I'm being told by Toyota that I need to replace an 8K transmission out of pocket and my Highlander has less

---

[12]    https://www.reddit.com/r/ToyotaHighlander/comments/1e8rr2w/transmission _bites_the_dust_keep_or_sell/ (complaint posted approximately November 2024) (last visited Nov. 3, 2025).

[13]    https://www.reddit.com/r/ToyotaHighlander/comments/1h191do/highlander _defective_transmission_toyota_please/ (complaint posted approximately November 2024) (last visited Nov. 3, 2025).

29

00226851

than 80k miles. This isn't an isolated case, I've seen this posted here and on other forums. The service department at my dealership said Toyota ought to help, that this had happened before with Rav-4, and I have found many other Highlander customers with the same issue online. I called Toyota and the initial call indicated that they will cover nothing, despite even the dealership saying they would be shocked if they didn't help. A supervisor is supposed to call me back tomorrow."[14]

77.    Owners across these platforms describe vehicles that hesitate, surge, or lose power while accelerating; multiple transmission replacements failing again within months; and dealers acknowledging that Toyota is aware of the issue but has no fix. Toyota's Customer Experience Center and field engineers regularly review these reports to assess product-quality trends and feed them into Toyota's internal quality reporting systems. Upon information and belief, Toyota tracks and analyzes such complaints through its North American Field Quality Offices, which interface directly with dealers and consumer-affairs personnel.

78.    Despite this extensive knowledge, Toyota and Aisin concealed the Transmission Defect from consumers and regulators, continued to market the Class Vehicles as safe and dependable, directed dealers to reassure customers that the behavior was 'normal,' and issued successive TSBs narrowing coverage rather than recalling affected vehicles.

79.    Defendants' failure to redesign the Transmission Assemblies or warn consumers was deliberate, motivated by the cost of recall and reputational risk.

80.    In addition to Toyota's knowledge and concealment, Aisin possessed the same, if not greater, knowledge of the Transmission Defect as Toyota. Aisin engineers co-designed and validated the 8-speed transmission and torque converter, participated in joint failure-mode analyses with Toyota, and supplied technical reports documenting abnormal thermal stress and clutch degradation during prototype testing.

---

[14]    https://www.reddit.com/r/ToyotaHighlander/comments/1f938tj/toyota_highlander_transmission_issues/ (complaint posted approximately November 2024) (last visited Nov. 3, 2025).

CLASS ACTION COMPLAINT

Aisin's own patent filings from the relevant period reflect its knowledge of excessive heat generation, torque-converter clutch slippage, and ATF oxidation in its 8-speed automatic transmission designs—issues Aisin sought to mitigate through modified clutch-control logic and lubrication schemes. Those patents confirm that Aisin was aware of, and actively researching, the same failure modes underlying the Transmission Defect. Despite this knowledge, Aisin continued supplying the defective assemblies and jointly approved their installation in Class Vehicles, concealing the problem from regulators, dealers, and consumers.

81.    As a result, Plaintiff and Class Members purchased or leased vehicles they reasonably believed were safe and durable, when Defendants already knew they contained a latent defect that could cause sudden loss of motive power. Defendants' conduct was knowing, willful, and in conscious disregard of consumer safety.

82.    The Transmission Defect compromises both the drivability and safety of the Class Vehicles, exposing occupants and the motoring public to sudden loss of motive power. Vehicles that unpredictably hesitate, surge, or fail to accelerate are inherently unsafe and unmerchantable and, as such, are not fit for their ordinary and intended purpose of providing safe and reliable transportation.

## *Defendants' Uniform Marketing and Omissions Regarding the Safety and Reliability of the Class Vehicles*

83.    Toyota and Aisin marketed the Class Vehicles as safe, reliable, and technologically advanced while concealing the Transmission Defect. For years, Toyota has invested billions to brand itself as the maker of dependable, long-lasting vehicles—reinforcing that image through coordinated television, print, digital, and in-dealership campaigns that emphasize "safety," "reliability," and "quality engineering." These uniform messages were material to consumers and drove premium pricing for Toyota and Lexus vehicles equipped with Aisin's 8-speed transmission.

CLASS ACTION COMPLAINT

84. Toyota's website tells consumers: "We build America's bestselling cars and trucks tot help you and your family go places reliably and safely" and through "The Toyota Way…we create some of the world's most advanced, reliable and safe vehicles[.]"[15] Its "Toyota Safety Sense" webpage highlights "advancing the goal of safety for all,"[16] and its sales brochures for every Class Vehicle reiterate those same themes of safety, smooth performance, and engineering precision.

85. In marketing the Transmission Assemblies specifically, Toyota and Aisin jointly promoted the "Direct Shift 8-Speed Automatic" as a major technological advancement. A 2013 SAE International paper co-authored by both companies described the transmission as the "world's first transverse 8-speed automatic," combining "world-class fuel economy" with "smooth gear shift and sporty feeling suitable for luxury cars."[17] Subsequent Toyota press releases and model brochures echoed those claims, portraying the 8-speed as providing "seamless acceleration," "refined power delivery," and "improved efficiency."

86. Toyota's brochures repeated these assurances across models and years: the 2018 Highlander was said to deliver "the power and efficiency to take your journey farther"[18]; the 2018 Camry's 8-speed transmission purportedly "improves acceleration from a stop, provides a smooth ride at highway speeds and helps enhance fuel efficiency"[19]; the 2019 RAV4's transmission is "engineered to provide impressive acceleration and enhance fuel efficiency"[20]; and the 2020 Highlander's transmission "maximizes acceleration and highway merging capability while

---

[15] https://www.toyota.com/usa (last visited Nov. 3, 2025).

[16] https://www.toyota.com/safety-sense/ (last visited Nov. 3, 2025).

[17] *Supra*, footnote 3.

[18] https://cdn.dealereprocess.org/cdn/brochures/toyota/2018-highlander.pdf

[19] https://cdn.dealereprocess.org/cdn/brochures/toyota/2018-camry.pdf

[20] https://cdn.dealereprocess.org/cdn/brochures/toyota/2019-rav4.pdf

operating seamlessly and transparently."[21] Each representation conveyed that the transmission would enhance safety, performance, and longevity—none disclosed that it was prone to hesitation, surging, slippage, and sudden loss of motive power.

87.    Toyota's marketing materials and dealer-distributed brochures are centrally developed and approved by Toyota Motor North America before release. Toyota requires its network of dealerships to use those materials, ensuring a uniform nationwide message. Dealers were never provided information about the Transmission Defect and were instead instructed to reassure customers that the transmission's erratic behavior was "normal operation."

88.    Aisin likewise represented on its corporate website that its "Strategy" is "Ensuring customer peace of mind and safety by establishing a global system that delivers the highest quality," and that among its "Key initiatives" is "During development, we reevaluate safety and regulatory compliance from the customer's perspective"—positioning itself as a leader in quality and reliability.[22] These statements were false and misleading because Aisin knew its 8-speed design suffered from heat-related torque-converter degradation and internal clutch wear that impaired drivability and safety.

89.    Through this coordinated marketing, Toyota and Aisin created and perpetuated a false impression that the Class Vehicles offered exceptional reliability, performance, and safety. In reality, the vehicles contained a latent Transmission Defect that caused hesitation, surging, and sudden loss of power—conditions fundamentally inconsistent with Toyota's core brand promises.

90.    As a result of these uniform misrepresentations and omissions, Plaintiff and Class Members purchased or leased Class Vehicles they reasonably believed were

---

[21]    https://pressroom.toyota.com/world-premiere-of-all-new-2020-highlander-at-new-york-international-auto-show/

[22]    https://www.aisin.com/en/sustainability/social/quality/ (last visited Nov. 3, 2025).

CLASS ACTION COMPLAINT

safe and dependable, when in fact Defendants knew they were defective, unsafe, and unfit for their ordinary purpose.

91.    Toyota's and Aisin's representations and omissions were material to reasonable consumers. Safety, reliability, and performance are core considerations in the purchase of any vehicle, and Toyota's branding is built on those precise attributes. Consumers reasonably expect that a manufacturer advertising "quality," "dependability," and "safety" has disclosed known defects that pose a risk of drivability failure or loss of power.

92.    Defendants' uniform omissions and affirmative representations were likely to mislead reasonable consumers acting reasonably under the circumstances. Each message—whether in national advertising, digital marketing, or standardized dealer brochures—communicated that the Class Vehicles were safe, reliable, and well-engineered. In reality, Defendants knew that the Transmission Assemblies were prone to premature wear, erratic shifting, and sudden loss of motive power.

93.    Had Toyota disclosed the existence and nature of the Transmission Defect, reasonable consumers would have viewed the information as important in deciding whether to purchase or lease the Class Vehicles, and would have paid substantially less or declined to purchase altogether.

94.    Because the Class Vehicles were marketed as safe and dependable despite the concealed defect, Plaintiff and Class Members paid a price premium they would not otherwise have paid and were deprived of the benefit of their bargain.

***Toyota's Continued Misrepresentations and Failure to Provide an Effective Repair***

95.    Even after receiving widespread consumer complaints, Toyota continued to misrepresent the condition of the Class Vehicles and failed to implement a permanent repair. Toyota's internal communications instructed service departments to assure customers that the transmission behavior was "normal" and to perform limited software updates or replace defective components with identical parts known to fail again.

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

00226851

96.     Toyota's Technical Service Bulletins and warranty-extension programs merely substituted one defective Transmission Assembly for another, without correcting the underlying design flaw. In many cases, replacement transmissions failed within months, yet Toyota refused to acknowledge the issue or provide further relief. Toyota never issued a recall or public notice warning drivers of the risk of hesitation, surging, or sudden loss of power.

97.     Toyota's concealment is ongoing. To this day, Toyota continues to sell and service vehicles equipped with the same or substantially similar 8-speed transmission while denying the existence of any defect. Dealers continue to advertise these vehicles as safe, dependable, and "built to last," and Toyota has not instructed owners to cease driving or taken steps to warn them of the danger posed by the Transmission Defect.

98.     Through this continued pattern of omission and misrepresentation, Toyota has maintained an information imbalance that prevents consumers from making informed purchasing and safety decisions. Toyota's ongoing conduct constitutes unfair, unlawful, and deceptive business practices under the UCL and CLRA and demonstrates the need for injunctive relief to protect the public from further harm.

### *Dealers as Toyota's Agents and Class Members as Third-Party Beneficiaries*

99.     Toyota's authorized dealerships acted as its agents in selling, leasing, and servicing the Class Vehicles. Each dealership agreement requires compliance with Toyota's sales policies, warranty procedures, and advertising guidelines, and Toyota exercises substantial control over the manner of sale, financing, and customer interaction. Toyota trains and certifies dealer personnel, approves all marketing and point-of-sale materials, and retains the right to terminate dealerships that fail to follow its directives.

100.    Through these dealerships, Toyota and Aisin made uniform representations to consumers concerning the safety, reliability, and performance of

BLOOD HURST & O' REARDON, LLP

CLASS ACTION COMPLAINT

the Class Vehicles. Toyota's knowledge of the Transmission Defect and its omissions are therefore imputed to its authorized dealers, and the dealers' representations and warranties are attributable to Toyota.

101.   Plaintiff and Class Members purchased or leased their Class Vehicles from Toyota's authorized dealerships or online platforms operating under Toyota's control. Accordingly, Toyota is directly liable for, and bound by, its dealers' representations, sales practices, and warranty obligations.

102.   Plaintiff and Class Members are also intended third-party beneficiaries of the express and implied warranties issued by Toyota and Aisin, which were made to induce sales and to assure consumers that the Class Vehicles were of merchantable quality, safe, and fit for ordinary use. These warranties were intended to benefit subsequent purchasers and lessees and therefore extend to all Class Members.

Applicable Warranties and Pre-Suit Notice

103.   Each Class Vehicle was sold or leased with Toyota's New Vehicle Limited Warranty and Powertrain Warranty, both of which promise to repair or replace defective materials or workmanship during the warranty period. Toyota also issued supplemental warranties and customer-support programs addressing transmission behavior in certain Class Vehicles.

104.   Plaintiff and Class Members complied with all conditions precedent or were excused from doing so. Plaintiff provided pre-suit notice to Toyota, including pursuant to California Commercial Code § 2607(3)(A) and Civil Code § 1782(a). Toyota has not offered to repair, replace, or refund the vehicles in compliance with its warranty obligations.

105.   To the extent any additional notice is required, Toyota received repeated actual notice through its own warranty claims, internal field reports, and communications with dealers and NHTSA. These notices fully satisfied any statutory or contractual notice prerequisites.

1

***Fraudulent Concealment and Tolling of the Limitations Period***

2      106.   Any applicable statutes of limitation were tolled by Defendants'

3   knowing and active concealment of the Transmission Defect and by the delayed

4   discovery rule. Toyota and Aisin had exclusive knowledge of the defect's existence

5   and cause, which could not have been discovered by reasonable diligence prior to

6   failure.

7      107.   Defendants' concealment included false assurances that the transmission

8   behavior was "normal," failure to disclose the defect's existence or safety risks, and

9   the issuance of TSBs and warranty extensions falsely framing the issue as a

10   "calibration" concern. Such conduct prevented Plaintiff and Class Members from

11   discovering the truth and tolled the running of any limitations period.

12      108.   Toyota and Aisin are further estopped from asserting any statute-of-

13   limitations defense because they knowingly concealed material facts with the intent

14   that consumers would rely on their representations and forgo timely legal action.

15   Plaintiff and Class Members reasonably relied on Defendants' superior knowledge

16   and reassurances, which delayed discovery of their claims.

17                              **CLASS ALLEGATIONS**

18      109.   Plaintiff brings this action as a class action pursuant to Federal Rule of

19   Civil Procedure 23(b)(2) and (b)(3) on behalf of the following Class:

20      Nationwide Class: All current and former owners or lessees of a Class
        Vehicle (as defined herein) that was purchased or leased in the United
21      States, the District of Columbia, Puerto Rico, or any other United States
        territory or possession.
22

23      110.   In the alternative, and only if the Court declines to apply California law

24   nationwide, Plaintiff brings certain counts on behalf of the following subclasses:

25      Multistate Class: All current and former owners or lessees of a Class Vehicle
        that was purchased or leased in states whose consumer-protection or common-
26      law doctrines are materially similar to California's, including but not limited to
27      California, the District of Columbia, Florida, Illinois, Massachusetts,

28

00226851

BLOOD HURST & O' REARDON, LLP

BLOOD HURST & O' REARDON, LLP

Michigan, Minnesota, Missouri, New Hampshire, New Jersey, New York, Rhode Island, Texas, Washington, and Wisconsin.[23]

<u>California Class</u>: All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in California.

111.   Excluded from the Classes are Defendants, their parents, subsidiaries, affiliates, officers, and directors, all persons who make a timely election to be excluded from the Class, the judge to whom this case is assigned and any immediate family members thereof. Plaintiff reserves the right to modify, amend, or expand the Class definitions as warranted by discovery or the Court's rulings on class certification.

112.   Plaintiff seeks certification of each cause of action on behalf of the Nationwide Class, or in the alternative on behalf of the Multistate or California Class as appropriate. Different counts may apply to different Classes depending on the applicable law, as specified in each Count below.

113.   Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

114.   **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that their individual joinder is impracticable. Plaintiff is informed and believe that hundreds of thousands of Class Vehicles were sold across the United States. The number and identity of Class members can be obtained through business records regularly maintained by Defendants, their employees and agents and

---

[23]   The specific states included in the Multistate Class may vary by claim. For example, the consumer-protection Multistate Class includes states with statutes materially similar to the California Unfair Competition Law ("UCL") and Consumers Legal Remedies Act ("CLRA"), while the common-law Multistate Class (e.g., for fraudulent concealment or unjust enrichment) includes states whose common-law doctrines of omission or restitution are substantially similar to California's.

CLASS ACTION COMPLAINT

state agencies. Members of the Class can be notified of the pending action by e-mail and mail, supplemented by published notice, if necessary.

115. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

(a)     Whether the Class Vehicles suffer from the Transmission Defect;

(b)     Whether the Class Vehicles contain a design defect and/or a defect in material, manufacturing and/or workmanship;

(c)     Whether the Transmission Defect constitutes an unreasonable safety hazard;

(d)     Whether Defendants knew or should have known about the Transmission Defect and, if so, how long Defendants have known of the Transmission Defect;

(e)     Whether Defendants had a duty to disclose that the Class Vehicles suffer from the Transmission Defect;

(f)     Whether Defendants breached their duty to disclose that the Class Vehicles suffer from the Transmission Defect;

(g)     Whether Defendants intentionally and knowingly falsely misrepresented, concealed, suppressed and/or omitted material facts including the fact that the Class Vehicles suffered from the Transmission Defect;

(h)     Whether Defendants negligently and falsely misrepresented or omitted material facts including the fact that the Class Vehicles suffered from the Transmission Defect;

(i)     Whether Defendants made material misrepresentations and/or omissions concerning the standard, quality or grade of the Class Vehicles and the Transmission Defect;

39

CLASS ACTION COMPLAINT

1    (j)    Whether members of the Class would have paid less for the Class
2    Vehicles if Defendants, at the time of purchase or lease, disclosed
3    that the vehicles suffered from the Transmission Defect;

4    (k)    Whether Defendants are liable to Plaintiff and the Class for
5    breaching their express and/or implied warranties;

6    (l)    Whether Defendants violated applicable state consumer protection
7    statutes;

8    (m)    Whether Defendants have been unjustly enriched; and

9    (n)    Whether Plaintiff and the Class are entitled to damages,
10    restitution, equitable, injunctive, compulsory, or other relief.

116.  **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the uniform prohibited conduct described above.

117.  **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the other Class Members that Plaintiff seek to represent; Plaintiff has retained counsel competent and experienced in class action litigation; and Plaintiff intends to prosecute this action vigorously. The interests of the Class Members will be fairly and adequately protected by Plaintiff and his counsel.

118.  **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other Class Members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to Class as a whole.

119.  **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the

BLOOD HURST & O' REARDON, LLP

BLOOD HURST & O' REARDON, LLP

management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS FOR RELIEF

## COUNT 1

### Fraudulent Omission/Concealment

120.    Plaintiff incorporates and realleges each of the preceding paragraphs as though fully set forth herein.

121.    Plaintiff brings this Count individually and on behalf of the Nationwide Class. California law governs the claims of all Class Members because the wrongful conduct alleged herein originated in and was directed from California. Toyota Motor Sales, U.S.A., Inc. ("TMS")—which manages product quality, technical communications, warranty administration, and marketing for all Toyota and Lexus vehicles sold in the United States—maintains its principal offices in California. Aisin likewise conducts substantial business and engineering operations in California through its North American affiliates, which collaborate with Toyota on vehicle design, testing, and warranty analytics. The decisions to conceal the Transmission Defect, issue misleading technical communications, and market the Class Vehicles as safe and reliable were made or implemented by personnel located in California.

122.    California has the predominant interest in applying its law to the conduct at issue. The deceptive and unfair practices alleged here were conceived, coordinated,

1  and disseminated from within California by Defendants' California-based operations,
2  and applying one uniform standard best serves California's strong policy of regulating
3  in-state corporate behavior that affects consumers nationwide. Subjecting this
4  controversy to a patchwork of differing state laws would impair California's ability
5  to police the conduct of companies operating here and would undermine judicial
6  efficiency and consistency of result.

7       123.   Application of California law to the claims of the Nationwide Class is
8  proper and constitutional. The challenged conduct emanated from California, and
9  Defendants maintain substantial operations and continuous contacts here. California
10 therefore has a significant aggregation of contacts with each Class Member's claims
11 sufficient to satisfy constitutional due process. Under California's choice-of-law
12 rules, California law may be applied on a classwide basis because the interests of other
13 states do not materially conflict with California's strong interest in regulating
14 misconduct that originated within its borders.

15      124.   In the alternative, and only if the Court declines to apply California law
16 nationwide, Plaintiff brings this Count on behalf of a Multistate Class consisting of
17 Class Members residing in jurisdictions whose common-law fraudulent-concealment
18 and misrepresentation doctrines are substantially similar to California's and would
19 permit recovery on materially identical facts. These include, without limitation:
20 California, Nevada, and Utah.[24] The laws of these jurisdictions, like California's,
21 recognize liability for fraudulent omission where a manufacturer possesses exclusive
22

23 [24]    The states in the Multistate Class are limited to those jurisdictions whose
24 common law fraudulent concealment and misrepresentation doctrines are materially
   similar to California's under the facts of this case. Each recognizes liability where a
25 defendant knowingly conceals or omits a material fact it has a duty to disclose,
   including when it possesses superior knowledge of a latent defect. *See, e.g.*, *Flier v.*
26 *FCA US LLC*, No. 21-cv-02553-CRB, 2022 U.S. Dist. LEXIS 203519, at *11–13
   (N.D. Cal. Nov. 8, 2022) (California law); *Miller v. GM, LLC*, 773 F. Supp. 3d 461,
27 510 (E.D. Mich. 2025) (Utah law); *Dow Chem. Co. v. Mahlum*, 114 Nev. 1468, 1486
28 (1998) (Nevada law).

BLOOD HURST & O' REARDON, LLP

CLASS ACTION COMPLAINT

00226851

or superior knowledge of a material defect and fails to disclose it. The claims of the Multistate Class may be adjudicated together because they present no material conflicts under the facts alleged and reflect substantially identical policy interests in deterring corporate concealment and protecting consumers. To the extent any material conflict is shown at the class-certification stage, Plaintiff reserves the right to propose subclasses or pursue claims under the laws of individual states as appropriate.

125.   In the further alternative, if the Court determines that only California residents' claims may proceed under California law, Plaintiff brings this Count on behalf of the California Class.

126.   Defendants intentionally and knowingly falsely concealed, suppressed, and omitted material facts including the standard, quality or grade of the Class Vehicles and the fact that the Transmission Assemblies in the Class Vehicles are defective, exposing drivers, occupants, and members of the public to safety risks with the intent that Plaintiff and the other Class Members rely on Defendants' omissions.

127.   As a direct result of Defendants' fraudulent conduct, Plaintiff and the other members of the Class have suffered actual damages.

128.   As a result of Defendants' failure to disclose to Plaintiff and the other Class Members the material fact that the Transmission Assemblies in the Class Vehicles are defective, owners and lessors of the Class Vehicles are required to spend thousands of dollars to repair or replace the Transmission Assemblies and related components or sell their vehicles at a substantial loss. The fact that the Transmission Assemblies in the Class Vehicles are defective are material because no reasonable consumer expects that he or she will have to spend thousands of dollars for diagnosis, repair, or replacement of the Transmission, and because Plaintiff and the other Class Members had a reasonable expectation that the vehicles would not suffer from the Transmission Defect.

129.   The fact that the Transmission Assemblies installed in the Class Vehicles are defective is also material because it presents a safety risk and places the driver and

BLOOD HURST & O' REARDON, LLP

00226851

occupants at risk of serious injury or death. Because of the Transmission Defect, the Class Vehicles Transmission Assemblies' may catastrophically fail or not perform as intended, drivers and occupants of the Class Vehicles are at risk for rear-end collisions and other accidents caused by the Transmission Defect, and the general public is also at risk for being involved in an accident with a Class Vehicle. Plaintiff and the other Class Members would not have purchased or leased the Class Vehicles but for Defendants' omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the Transmission Defect, or would have paid less for the Class Vehicles.

130.    Defendants knew their concealment and suppression of material facts was false and misleading and knew the effect of concealing those material facts. Defendants knew their concealment and suppression of the Transmission Defect would sell more Class Vehicles.

131.    Despite notice of the Transmission Defect from, among other things, pre-production testing, numerous consumer complaints, warranty data, and dealership repair orders, Defendants have not recalled the Class Vehicles to repair the Transmission Defect, have not offered customers a suitable repair or replacement free of charge, and have not offered to reimburse all Class Members the costs they incurred relating to diagnosing and repairing the Transmission Defect or for the premium price that they paid for the Class Vehicle.

132.    At minimum, Defendants knew about the Transmission Defect by way of customer complaints filed with affiliated dealerships and through the NHTSA, as extensively documented above. As such, Defendants acted with malice, oppression, and fraudulent intent. Plaintiff and the other Class Members reasonably relied upon Defendants' knowing, affirmative and active false representations, concealment, and omissions.

133.    As a direct and proximate result of Defendants' false representations, omissions, and active concealment of material facts regarding the Transmission

00226851

BLOOD HURST & O' REARDON, LLP

Defect, Plaintiff and the other Class Members have suffered actual damages in an amount to be determined at trial.

## COUNT 2

### Violation of California's Consumer Legal Remedies Act
### (Cal. Civil Code § 1750, et seq.)

134.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

135.    Plaintiff brings this Count individually and on behalf of the Nationwide Class. California law governs the claims of all Class Members because the wrongful conduct alleged in this Complaint originated in and was directed from California. Toyota Motor Sales, U.S.A., Inc. ("TMS")—which manages product quality, technical communications, warranty administration, and marketing for all Toyota and Lexus vehicles sold in the United States—maintains its principal offices in California. Aisin also conducts substantial business and engineering operations in California through its North American affiliates, which collaborate with Toyota on vehicle design, testing, and warranty analytics. The decisions to conceal the Transmission Defect, issue misleading technical communications, and market the Class Vehicles as safe and reliable were made or implemented by personnel located in California.

136.    California has the predominant interest in applying its law to the conduct at issue. The deceptive and unfair practices alleged here were conceived, coordinated, and disseminated from within California by Defendants' California-based operations, and applying one uniform standard best serves California's strong policy of regulating in-state corporate behavior that affects consumers nationwide. Subjecting this controversy to a patchwork of differing state laws would impair California's ability to police the conduct of companies operating here and would undermine judicial efficiency and consistency of result.

137.    Application of California law to the claims of the Nationwide Class is proper and constitutional. The challenged conduct emanated from California, and

45

Defendants maintain substantial operations and continuous contacts here. California therefore has a significant aggregation of contacts with each Class Member's claims sufficient to satisfy constitutional due process. Further, under California's choice-of-law rules, California law may be applied on a classwide basis because the interests of other states do not materially conflict with California's strong interest in regulating misconduct that originated within its borders.

138.   In the alternative, and only if the Court declines to apply California law nationwide, Plaintiff brings this Count on behalf of a Multistate Class consisting of Class Members residing in jurisdictions whose consumer-protection statutes are substantially similar to the CLRA and would permit recovery on materially identical facts. These include, without limitation: California, the District of Columbia, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Hampshire, New Jersey, New York, Rhode Island, Texas, Washington, and Wisconsin.[25] These statutes, like the CLRA, broadly prohibit unfair or deceptive acts or practices and do not require individualized proof of reliance or privity. The claims of the Multistate Class may be adjudicated together because they present no material conflicts under the facts alleged and reflect substantially identical policy interests in deterring

---

[25]   The states in the Multistate Class are limited to those jurisdictions whose consumer-protection statutes are materially similar to California's Unfair Competition Law under the facts of this case—i.e., statutes that broadly prohibit deceptive or unfair business practices and do not require individualized proof of reliance or privity. *See, e.g.*, California (Cal. Bus. & Prof. Code § 17200 et seq.; Cal. Civ. Code § 1750 et seq.); District of Columbia (D.C. Code § 28-3901 et seq.); Florida (Fla. Stat. § 501.201 et seq.); Illinois (815 ILCS 505/1 et seq.); Massachusetts (Mass. Gen. Laws ch. 93A et seq.); Michigan (Mich. Comp. Laws § 445.901 et seq.); Minnesota (Minn. Stat. § 325F.68 et seq.); Missouri (Mo. Rev. Stat. § 407.010 et seq.); New Hampshire (N.H. Rev. Stat. Ann. § 358-A:1 et seq.); New Jersey (N.J. Stat. Ann. § 56:8-1 et seq.); New York (N.Y. Gen. Bus. Law §§ 349, 350 et seq.); Rhode Island (R.I. Gen. Laws ch. 6-13.1); Texas (Tex. Bus. & Com. Code § 17.41 et seq.); Washington (Wash. Rev. Code § 19.86.010 et seq.); and Wisconsin (Wis. Stat. § 100.18 et seq.).

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

00226851

corporate misconduct and protecting consumers. To the extent any material conflict is shown at the class certification stage, Plaintiff reserves the right to propose subclasses or pursue claims under the laws of individual states as appropriate.

139.    In the further alternative, if the Court determines that only California residents' claims may proceed under California law, Plaintiff brings this Count on behalf of the California Class.

140.    Plaintiff and Class Members are "consumers," Defendants are "persons," and the Class Vehicles are "goods" within the meaning of the CLRA. Cal. Civ. Code § 1761(a), (c) and (d).

141.    Defendants violated and continue to violate the CLRA by engaging in the following unfair methods of competition and unfair or deceptive acts or practices proscribed by California Civil Code section 1770(a) in transactions with Plaintiff and the Class which were intended to result in, and did result in, the sale of the Class Vehicles:

(5)    Representing that goods . . . have . . . approval, characteristics, . . . uses [and] benefits . . . which [they do] not have . . . .

(7)    Representing that goods . . .  are of a particular standard, quality or grade . . . if [they are] of another.

(9)    Advertising goods . . . with intent not to sell them as advertised.

(15)    Representing that a part, replacement, or repair service is needed when it is not.

(16)    Representing that [goods] have been supplied in accordance with a previous representation when [they have] not.

*See* Cal. Civil Code §§ 1770(a)(5), (7), (9), (15) and (16).

142.    Defendants violated the CLRA by representing and failing to disclose material facts about the Class Vehicles' Transmission Assemblies, as described above, when they knew, or should have known, that the representations were false and misleading and that the omissions were of material facts they were obligated to

BLOOD HURST & O' REARDON, LLP

47

00226851

1    disclose. Furthermore, Defendants represented that the replacement Transmission
2    Assemblies were needed, when they knew that the replacement Transmission
3    Assemblies suffer from the same design defect and are remanufactured with equally
4    defective parts or by the same defective manufacturing process and, as a result,
5    continue to suffer from the Transmission Defect.

6        143.  Defendants' violations of the CLRA proximately caused injury in fact to
7    Plaintiff and the Class.

8        144.  Defendants' unfair and deceptive acts or practices occurred repeatedly
9    in Defendants' trade or business, were capable of deceiving a substantial portion of
10   the purchasing public, and imposed a serious safety risk on the public.

11       145.  By failing to disclose the Transmission Defect, Defendants knowingly
12   and intentionally concealed material facts and breached their duty not to do so.

13       146.  The facts concealed or not disclosed by Defendants to Plaintiff and the
14   other Class Members are material because a reasonable consumer would have
15   considered them to be important in deciding whether to purchase the Class Vehicles,
16   the replacement transmission assemblies, or to pay less for them. Plaintiff and the
17   other Class Members are reasonable consumers who do not expect that their vehicles
18   will suffer from a Transmission Defect. Had Plaintiff and the other Class Members
19   known that the Class Vehicles' Transmissions are defective, they would not have
20   purchased the Class Vehicles, replacement transmission assemblies, or would have
21   paid less for them.

22       147.  Pursuant to § 1782(d) of the Act, Plaintiff and the Class seek a court
23   order enjoining the above-described wrongful acts and practices of Defendants and
24   for restitution and disgorgement, attorneys' fees and costs, and any other relief the
25   Court deems proper.

26       148.  Plaintiff and the Class lack an adequate remedy at law to address
27   Defendants' violations of the CLRA. Legal damages alone cannot remedy the full
28   extent of the harm because Plaintiff and Class members continue to own and drive

BLOOD HURST & O' REARDON, LLP

their vehicles and remain exposed to the Transmission Defect, and damages do not prevent Defendants from continuing to misrepresent and conceal the safety risks associated with the Class Vehicles. Restitution is necessary to restore to Plaintiff and the Class the monies wrongfully obtained by Defendants, and injunctive relief is required to ensure that Defendants disclose the defect and ceases their unlawful conduct. Accordingly, equitable relief under Civil Code § 1780(a)(2) is proper.

149.    Pursuant to § 1782 of the CLRA, Plaintiff notified Defendants in writing by certified mail of the particular violations of § 1770 of the CLRA and demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendants' intent to so act. A copy of the letter is attached hereto as **Exhibit A**.

150.    If Defendants fail to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to § 1782 of the CLRA, Plaintiff will amend this Complaint to add claims for actual, punitive and statutory damages, as appropriate.

151.    Defendants' conduct is fraudulent, wanton and malicious.

152.    Pursuant to § 1780(d) of the CLRA, attached hereto as **Exhibit B** is the affidavit showing that this action has been commenced in the proper forum.

## <u>COUNT 3</u>

### Violation of California's Unfair Competition Law ("UCL")

### (Cal. Bus. & Prof. Code § 17200, et seq.)

153.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

154.    Plaintiff brings this Count individually and on behalf of the Nationwide Class. California law governs the claims of all Class Members because the wrongful conduct alleged in this Complaint originated in and was directed from California. Toyota Motor Sales, U.S.A., Inc. ("TMS")—which manages product quality,

BLOOD HURST & O'REARDON, LLP

00226851

technical communications, warranty administration, and marketing for all Toyota and Lexus vehicles sold in the United States—maintains its principal offices in California. Aisin also conducts substantial business and engineering operations in California through its North American affiliates, which collaborate with Toyota on vehicle design, testing, and warranty analytics. The decisions to conceal the Transmission Defect, issue misleading technical communications, and market the Class Vehicles as safe and reliable were made or implemented by personnel located in California.

155.    California has the predominant interest in applying its law to the conduct at issue. The deceptive and unfair practices alleged here were conceived, coordinated, and disseminated from within California by Defendants' California-based operations, and applying one uniform standard best serves California's strong policy of regulating in-state corporate behavior that affects consumers nationwide. Subjecting this controversy to a patchwork of differing state laws would impair California's ability to police the conduct of companies operating here and would undermine judicial efficiency and consistency of result.

156.    Application of California law to the claims of the Nationwide Class is proper and constitutional. The challenged conduct emanated from California, and Defendants maintain substantial operations and continuous contacts here. California therefore has a significant aggregation of contacts with each Class Member's claims sufficient to satisfy constitutional due process. Further, under California's choice-of-law rules, California law may be applied on a classwide basis because the interests of other states do not materially conflict with California's strong interest in regulating misconduct that originated within its borders.

157.    In the alternative, and only if the Court declines to apply California law nationwide, Plaintiff brings this Count on behalf of a Multistate Class consisting of Class Members residing in jurisdictions whose consumer-protection statutes are substantially similar to the UCL and would permit recovery on materially identical facts. These include, without limitation: California, the District of Columbia, Florida,

BLOOD HURST & O' REARDON, LLP

Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Hampshire, New Jersey, New York, Rhode Island, Texas, Washington, and Wisconsin.[26] These statutes, like the UCL, broadly prohibit unfair or deceptive acts or practices and do not require individualized proof of reliance or privity. The claims of the Multistate Class may be adjudicated together because they present no material conflicts under the facts alleged and reflect substantially identical policy interests in deterring corporate misconduct and protecting consumers. To the extent any material conflict is shown at the class certification stage, Plaintiff reserves the right to propose subclasses or pursue claims under the laws of individual states as appropriate.

158.   In the further alternative, if the Court determines that only California residents' claims may proceed under California law, Plaintiff brings this Count on behalf of the California Class.

159.   The UCL defines unfair competition to include any "unlawful, unfair or fraudulent business act or practice," as well as any "unfair, deceptive, untrue or misleading advertising." Cal. Bus. Prof. Code § 17200.

160.   In the course of conducting business, Defendants committed unlawful business practices by, among other things, making the representations (which also

---

[26]    The states in the Multistate Class are limited to those jurisdictions whose consumer-protection statutes are materially similar to California's Unfair Competition Law under the facts of this case—i.e., statutes that broadly prohibit deceptive or unfair business practices and do not require individualized proof of reliance or privity. *See, e.g.*, California (Cal. Bus. & Prof. Code § 17200 et seq.; Cal. Civ. Code § 1750 et seq.); District of Columbia (D.C. Code § 28-3901 et seq.); Florida (Fla. Stat. § 501.201 et seq.); Illinois (815 ILCS 505/1 et seq.); Massachusetts (Mass. Gen. Laws ch. 93A et seq.); Michigan (Mich. Comp. Laws § 445.901 et seq.); Minnesota (Minn. Stat. § 325F.68 et seq.); Missouri (Mo. Rev. Stat. § 407.010 et seq.); New Hampshire (N.H. Rev. Stat. Ann. § 358-A:1 et seq.); New Jersey (N.J. Stat. Ann. § 56:8-1 et seq.); New York (N.Y. Gen. Bus. Law §§ 349, 350 et seq.); Rhode Island (R.I. Gen. Laws ch. 6-13.1); Texas (Tex. Bus. & Com. Code § 17.41 et seq.); Washington (Wash. Rev. Code § 19.86.010 et seq.); and Wisconsin (Wis. Stat. § 100.18 et seq.).

BLOOD HURST & O' REARDON, LLP

51

00226851

constitutes advertising within the meaning of § 17200) and omissions of material facts, as set forth more fully herein, and violating Civil Code §§ 1572, 1573, 1709, 1711, 1770(a)(5), (7), (9) and (16), Business & Professions Code §§ 17200, et seq. and 17500, et seq., Civil Code § 1790 et seq., California Commercial Code §§ 2313 and 2314, and the common law.

161.   Plaintiff reserves the right to allege other violations of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

162.   In the course of conducting business, Defendants committed "unfair" business practices by, among other things, making the representations (which also constitute advertising within the meaning of § 17200) and omissions of material facts regarding the Class Vehicles and their defective transmissions, as set forth more fully herein. Defendants' misrepresentations and omissions provided no countervailing benefit to consumers or competition; they served only to increase sales and avoid warranty costs. The harm to Plaintiff and Class Members—who paid for vehicles that were unsafe and unmerchantable—far outweighs any alleged utility of Defendants' conduct. Defendants' acts offended established public policy, were immoral, unethical, oppressive, and unscrupulous, and caused substantial injury to consumers that they could not reasonably have avoided.

163.   Further, as set forth in this Complaint, Plaintiff alleges violations of consumer protection, unfair competition, and truth in advertising laws in California and other states, resulting in harm to consumers. Defendants' acts and omissions also violate and offend the public policy against engaging in false and misleading advertising, unfair competition, and deceptive conduct towards consumers. This conduct constitutes violations of the unfair prong of Business & Professions Code § 17200, et seq.

164.   There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein. Business &

52

BLOOD HURST & O' REARDON, LLP

00226851

Professions Code § 17200, et seq., also prohibits any "fraudulent business act or practice." In the course of conducting business, Defendants committed "fraudulent business act or practices" by, among other things, making the representations (which also constitute advertising within the meaning of § 17200) and omissions of material facts regarding the Class Vehicles and their Transmission Assemblies, as set forth more fully herein. Defendants made the misrepresentations and omissions regarding the Class Vehicles and their Transmission Assemblies, among other ways, by misrepresenting the Class Vehicles as safe, reliable, and technologically advanced while concealing the Transmission Defect, when, in fact, the representations are false and deceptive because of the Transmission Defect.

165.    Defendants' actions, claims, omissions, and misleading statements, as more fully set forth above, were also false, misleading and likely to deceive the consuming public within the meaning of Business & Professions Code § 17200, et seq.

166.    Plaintiff and the other members of the Class have in fact been deceived as a result of their reliance on Defendants' material representations and omissions, which are described above. This reliance has caused harm to Plaintiff and the other members of the Class, each of whom purchased or leased the Class Vehicles. Plaintiff and the other Class members have suffered injury in fact and lost money as a result of purchasing or leasing the Class Vehicles and Defendants' unlawful, unfair, and fraudulent practices.

167.    Defendants knew, or should have known, that their material misrepresentations and omissions would be likely to deceive and harm the consuming public and result in consumers making payments for Class Vehicles that are dangerous and defective and do not provide the uses, benefits or characteristics that were promised or reasonably expected.

00226851

168.   As a result of their deception, Defendants were unjustly enriched by receiving payments from Plaintiff and the Class in return for providing Plaintiff and the Class the Class Vehicles that are dangerous and do not perform as advertised.

169.   Defendants continue to conceal the dangerous and defective nature of the Class Vehicles and their Transmissions even after Plaintiff and the other Class Members began to report problems. Indeed, Defendants continue to cover up and conceal the true nature of this systematic problem today.

170.   Unless restrained and enjoined, Defendants will continue to engage in the unlawful, unfair and fraudulent conduct described herein.

171.   Accordingly, Plaintiff, individually and on behalf of all others similarly situated, and on behalf of the general public, seeks restitution from Defendants of all money obtained from Plaintiff and the other members of the Class collected as a result of Defendants' unfair competition, and for an injunction prohibiting Defendants from continuing and further engaging in their unlawful, unfair and fraudulent conduct, requiring corrective advertising, and awarding all other relief this Court deems appropriate.

172.   Plaintiff and the Class lack an adequate legal remedy to address Defendants' misconduct. Legal damages alone cannot remedy the full extent of the harm because Plaintiff and Class members continue to own and drive their Class Vehicles and remain exposed to the Transmission Defect that Defendants continue to conceal and refuses to fix, and damages do not prevent Defendants from continuing to misrepresent and conceal the safety risks associated with the Class Vehicles. Restitution is necessary to restore to Plaintiff and the Class the monies wrongfully obtained by Defendants, and injunctive relief is required to ensure that Defendants disclose the defect and ceases their unlawful conduct. In any event, any legal remedy that does exist is not as prompt, certain, or efficient as the equitable remedies sought, including because the claims giving rise to potential damages are subject to legal defenses and more stringent elements (for example, intent) not applicable under the

CLASS ACTION COMPLAINT

UCL, and the scope of actionable misconduct under the unfair prong of the UCL is broader than other available claims. Even if Plaintiff prevails and recovers legal damages under certain claims, those remedies may represent recovery for different harm than that which could be remedied under the UCL. Thus, Plaintiff may be entitled to restitution or injunctive relief under the UCL even if legal damages are unavailable, limited, or directed at different injuries. Plaintiff pleads this claim separately and in the alternative under Fed. R. Civ. P. 8(a)(3), such that if the Court dismisses or enters judgment against Plaintiff on his damages claims, he will otherwise lack an adequate remedy at law.

## COUNT 4

### Breach of Implied Warranty

### (U.C.C. § 2-314, et seq.; Cal. Comm. Code § 2314; Cal. Civ. Code § 1792, et seq. – Song-Beverly Consumer Warranty Act)

173.   Plaintiff incorporates and realleges each preceding paragraph as though fully set forth herein.

174.   Plaintiff brings this Count individually and on behalf of the California Class, or, in the alternative, on behalf of the Nationwide or Multistate Class to the extent other states' laws are materially similar to California's implied-warranty law.

175.   Plaintiff and the other Class Members purchased or leased the Class Vehicles from Defendants by and through their authorized agents for retail sales or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party. At all relevant times, Defendants were the manufacturers, distributors, warrantors, and/or sellers of Class Vehicles. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

176.   Defendants are and were at all relevant times "merchants," "sellers," and "manufacturers" of motor vehicles within the meaning of the Uniform Commercial

Code, Cal. Comm. Code § 2104(1), and the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1791(j).

177.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles within the meaning of the Uniform Commercial Code, Cal. Civ. Code § 1791(i) and Cal. Comm. Code § 10103.

178.   The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code and Cal. Civ. Code § 1791(a).

179.   Under Cal. Comm. Code § 2314 and Cal. Civ. Code § 1792, every sale of consumer goods carries with it an implied warranty that the goods are merchantable and fit for the ordinary purposes for which such goods are used, including safe and reliable transportation.

180.   Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for their ordinary purpose, would pass without objection in the trade, and would conform to the promises or affirmations made on their labels, marketing, and warranties.

181.   In fact, the Class Vehicles were sold and leased with defective 8-speed automatic transmissions and torque-converter assemblies that cause hesitation, harsh shifting, surging, slipping, and premature failure. Because of this Transmission Defect, the Class Vehicles were not of merchantable quality, were unfit for their ordinary purpose, and failed to conform to the promises and affirmations made by Defendants.

182.   The Transmission Defect substantially impairs the use, value, and safety of the Class Vehicles. As such, the vehicles would not pass without objection in the trade and would not be accepted by a reasonable consumer if the defect were disclosed.

183.   At the time of sale or lease, Defendants knew or should have known that the Class Vehicles were defective and not in merchantable condition, yet they failed to disclose the defect and refused to provide a permanent or adequate repair.

CLASS ACTION COMPLAINT

184.   Plaintiff and the Class Members performed all conditions precedent under the contract between the parties.

185.   Defendants are in privity with Plaintiff and the Class Members because Defendants and their authorized dealers were part of a single distributive chain, and the retail transactions were made pursuant to Defendants' express and implied warranties. Plaintiff and the Class Members were the intended beneficiaries of those transactions and of the implied warranties arising therefrom.

186.   As described above, Defendants were provided pre-suit notice of the Transmission Defect, and as such have been afforded a reasonable opportunity to cure their breach of written warranties. Any additional time to do so would be unnecessary and futile because Defendants have known of and concealed the Transmission Defect and, on information and belief, have refused to repair or replace the Transmissions free of charge despite the Transmission Defect's existence at the time of sale or lease of the Class Vehicles.

187.   Defendants' breach of implied warranty affected all Class Vehicles uniformly and constitutes a continuing course of conduct.

188.   As a direct and proximate result of Defendants' breach of implied warranty, Plaintiff and the Class Members have suffered damages, including the difference in value between the vehicles as delivered and as warranted, incidental and consequential damages, and diminution in resale value.

189.   Pursuant to Cal. Civ. Code § 1794, Plaintiff and the California Class are entitled to recover actual damages, incidental and consequential damages, costs, and reasonable attorneys' fees.

190.   Defendants' conduct was willful, entitling Plaintiff and the California Class to a civil penalty of up to two times the amount of actual damages pursuant to Cal. Civ. Code § 1794(c) and (e).

CLASS ACTION COMPLAINT

00226851

BLOOD HURST & O' REARDON, LLP

**COUNT 5**

**Breach of Express Warranty**

**(U.C.C. § 2-313, et seq.; Cal. Comm. Code § 2313; Cal. Civ. Code §§ 1793.2 & 1794 – Song-Beverly Consumer Warranty Act)**

191.   Plaintiff incorporates and realleges each preceding paragraph as though fully set forth herein.

192.   Plaintiff brings this Count individually and on behalf of the California Class, or, in the alternative, on behalf of the Nationwide or Multistate Class to the extent other states' laws are materially similar to California's express warranty law.

193.   Plaintiff and the other Class Members purchased or leased the Class Vehicles from Defendants by and through their authorized agents for retail sale or were otherwise expected to be the eventual purchasers or lessees of the Class Vehicles. At all relevant times, Defendants were the manufacturers, distributors, warrantors, and/or sellers of the Class Vehicles and knew or had reason to know of the particular purpose for which the Class Vehicles were purchased or leased.

194.   Defendants are and were at all relevant times "merchants," "sellers," and "manufacturers" of motor vehicles within the meaning of the Uniform Commercial Code, Cal. Comm. Code § 2104(1), and "manufacturers" and "distributors" of consumer goods under Cal. Civ. Code § 1791(j) and (k).

195.   With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles within the meaning of the Uniform Commercial Code and Cal. Civ. Code § 1791(i).

196.   The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code and the Song-Beverly Act, Cal. Civ. Code § 1791(a).

197.   In connection with the purchase or lease of each of the Class Vehicles, Defendants provide warranty coverage for the Class Vehicles under one or more manufacturer's warranties. For illustrative purposes, Toyota offers a 60-month or

58

00226851

60,000-mile Powertrain Warranty that purportedly "covers repairs needed to correct defects in materials and workmanship of any component . . . supplied by Toyota[.]" Other Class Vehicles, including certain Lexus models, are subject to substantially similar warranty terms. Under these warranties, Defendants promised to repair or replace defective transmission components free of charge if they failed due to defects in materials or workmanship.

198.    These affirmations of fact, promises, and undertakings constitute express warranties within the meaning of U.C.C. § 2-313, Cal. Comm. Code § 2313, and Cal. Civ. Code § 1791.2, and became part of the basis of the bargain between Defendants and Plaintiff and the other Class Members.

199.    Defendants breached the express warranties because the Class Vehicles were sold and leased with defective 8-speed automatic transmissions and torque-converter assemblies that cause hesitation, harsh shifting, surging, slipping, and premature failure. Despite their warranties, Defendants have refused and/or failed to repair the defect or provide an effective remedy, instead issuing temporary software updates or limited component replacements that did not cure the defect, thereby transferring the costs of repair and replacement to consumers.

200.    By failing to disclose the Transmission Defect and refusing to provide an effective repair, Defendants deprived Plaintiff and the Class Members of the benefit of their bargain and breached the express warranties promising to correct defects in materials or workmanship.

201.    Defendants further breached their obligations under the Song-Beverly Act, Cal. Civ. Code § 1793.2(b) and (d), by failing to service, repair, or replace the defective transmission systems within a reasonable time and after a reasonable number of repair attempts, and by failing to promptly repurchase or replace Class Vehicles that could not be conformed to their warranties.

202.    Plaintiff and the Class Members performed all conditions precedent under the contract between the parties.

00226851

BLOOD HURST & O' REARDON, LLP

203.  As described above, Defendants were provided pre-suit notice of the Transmission Defect, and as such have been afforded a reasonable opportunity to cure their breach of written warranties. Any additional time to do so would be unnecessary and futile because Defendants have known of and concealed the Transmission Defect and, on information and belief, have refused to repair or replace the Transmissions free of charge despite the Transmission Defect's existence at the time of sale or lease of the Class Vehicles.

204.  Defendants are in privity with Plaintiff and members of the Class. Plaintiff and Class Members, not the dealers, were the intended beneficiaries of the Class Vehicles and the associated written warranties. Defendants designed and manufactured the Class Vehicles, and created the advertising, marketing, and representations at issue and warranted the Class Vehicles to Plaintiff and members of the Class, either directly or through authorized agents. Purchase or lease through authorized dealers is sufficient to create privity because such authorized sellers act as Defendants' agents for the purpose of the sale and lease of the Class Vehicles. Further, Defendants knew the identity, purpose and requirements of Plaintiff and members of the Class and designed, manufactured and marketed the Class Vehicles to meet their requirements.

205.  Defendants' breaches were willful and knowing. Defendants knew that the Transmission Defect existed at the time of sale and that their purported repairs were ineffective but nevertheless continued to sell and lease Class Vehicles while representing them as defect-free.

206.  As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and the other Class Members have suffered damages, including the diminished value of their vehicles, out-of-pocket repair costs, and loss of use.

207.  Pursuant to Cal. Civ. Code § 1794, Plaintiff and the California Class are entitled to recover actual damages, incidental and consequential damages, costs, and reasonable attorneys' fees.

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

00226851

208.    Because Defendants' violations were willful, Plaintiff and the California Class are also entitled to a civil penalty of up to two times actual damages under Cal. Civ. Code § 1794(c) and (e).

209.    Finally, because of Defendants' breach of express warranty as set forth herein, Plaintiff and the other members of the Class assert, as additional and/or alternative remedies pursuant to U.C.C. § 2-608 and Cal. Comm. Code § 2608, revocation of acceptance and restitution of all purchase or lease payments, together with incidental and consequential damages as permitted by law.

## COUNT 6

### Unjust Enrichment

210.    Plaintiff incorporates and realleges each preceding paragraph as though fully set forth herein.

211.    Plaintiff brings this Count individually and on behalf of the California Class, or, in the alternative, on behalf of the Nationwide or Multistate Class to the extent other states' laws are materially similar to California's law of unjust enrichment and restitution.

212.    Plaintiff and the other Class Members conferred a benefit upon Defendants by purchasing or leasing the Class Vehicles at prices that incorporated the expectation of safe, reliable, and defect-free performance. Defendants knowingly accepted and retained this benefit while failing to disclose the Transmission Defect and refusing to repair or replace the defective transmissions.

213.    Defendants were unjustly enriched through the sale and lease of Class Vehicles containing the Transmission Defect and by avoiding the costs of repair, replacement, recall, or customer compensation. Defendants also benefited from the inflated reputational value and market share of the Toyota and Lexus brands resulting from their concealment of the defect.

214.    Defendants' retention of these benefits is unjust and inequitable because the consideration received from Plaintiff and the Class Members was not what they

61

bargained for. Had Plaintiff and the other Class Members known the true facts, they would not have purchased or leased the Class Vehicles, or would have paid substantially less for them.

215.   There exists a direct relationship between Defendants and Plaintiff and the Class Members sufficient to support restitution in equity and quasi-contract. Defendants' concealment and suppression of the Transmission Defect increased vehicle sales, deferred warranty costs, and protected corporate profits—all at the expense of consumers who unknowingly bore the cost of the defect.

216.   Plaintiff and the Class lack an adequate remedy at law to prevent Defendants' unjust enrichment. Legal damages do not adequately redress the full extent of Defendants' wrongful gains because they do not require Defendants to disgorge the benefits unjustly obtained from Plaintiff and the Class Members, nor do they address the ongoing nature of Defendants' misconduct. Accordingly, equitable relief in the form of restitution or disgorgement is necessary, and this claim is pled in the alternative under Fed. R. Civ. P. 8(a)(3).

217.   As a direct and proximate result of Defendants' wrongful conduct, Defendants have been unjustly enriched in an amount to be determined at trial.

218.   Equity and good conscience require that Defendants make restitution to Plaintiff and the Class Members for the benefits unjustly retained, including disgorgement of all revenues, profits, and gains derived from their misconduct, together with pre- and post-judgment interest as permitted by law.

## **DEMAND FOR JURY TRIAL**

219.   Plaintiff demands a jury trial on all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests relief against Defendants as set forth below:

BLOOD HURST & O' REARDON, LLP

A.      Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative and appointing the undersigned counsel as Class Counsel;

B.      Ordering restitution and disgorgement of all profits and unjust enrichment that Defendants obtained from Plaintiff and the Class Members as a result of Defendants' unlawful, unfair and fraudulent business practices;

C.      Ordering actual, statutory, exemplary and punitive damages for Plaintiff and the Class;

D.      Ordering declaratory and injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, and ordering Defendants to engage in a corrective advertising campaign;

E.      Ordering Defendants to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Class;

F.      Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded; and

G.      Ordering such other and further relief as may be just and proper.

Respectfully submitted,

Dated: March 2, 2021

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON II (247952)
PAULA R. BROWN (254142)
ADAM M. BUCCI (327312)

By:        *s/ Timothy G. Blood*
TIMOTHY G. BLOOD

501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com
pbrown@bholaw.com
abucci@bholaw.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT

00226851

BLOOD HURST & O' REARDON, LLP